## WAHL *v.* STATE OF INDIANA.

[No. 28,756. Filed May 18, 1951. Rehearing denied June 18, 1951.]

*Howard R. Hooper,* of Indianapolis, for appellant.

*J. Emmett McManamon,* Attorney General; *John Ready O'Connor* and *George W. Hand,* Deputy Attorneys General, for appellee.

JASPER, J.—Appellant was charged by indictment with murder in the first degree, under § 10-3401, Burns' 1942 Replacement. He was tried by jury, convicted, and sentenced to life imprisonment. The only question presented under the assignment of error is the overruling of the motion for a new trial.

Appellant first contends that the verdict of the jury is not sustained by sufficient evidence and is contrary to law.

The evidence discloses that on April 25, 1950, between 4:00 and 5:00 p.m., the deceased, Louise Woodford, was at the home of her mother, with appellant. An argument took place and appellant threatened to get gasoline "and set the house on fire and burn us up"; the police were called, and came, and found the deceased in bed; the officer ordered appellant to leave; appellant told the deceased to come on out, and they both left and went to a house across the street; the house in which the mother of the deceased was living and the house to which the deceased and appellant went were on Darnell Street, a half block from Fall Creek, in the City of Indianapolis; a police officer arrived at the home of the mother of the deceased at 7:52 p.m., on April 25, 1950; Gracie Hill and a man were living in a house across the street from the mother; later in the night—the time was estimated to be between 10:00 and 11:00 o'clock—the mother of

the deceased heard her daughter call "Mama" three times, from the vicinity of Fall Creek, and the man with whom the mother was staying nailed the door so that the mother could not go to her daughter; the next time the mother saw her daughter was on April 26, 1950, at about 5:00 a.m., in Gracie Hill's house, across the street, where she was lying on a bed, dead.

There was evidence that appellant had been a prize-fighter. The evidence further shows that between 7:00 and 8:00 a.m., on April 25, 1950, the deceased and appellant came to the house of Gracie Hill, which house was across the street from the mother of the deceased, and remained there practically all day; appellant and the deceased left that night, and Gracie Hill did not see them again until early in the morning of April 26th, when appellant came to her house; when he opened the door she was awakened and saw him carry a body in and place it on a bed and cover it up, and he said: "I'll see you later," and walked out; about three hours later the witness called to Louise Woodford and received no answer; she went to the bed and removed the covers, and her face was "blue looking," and she was dead; the police were then called.

There was evidence that at about 9:30 p.m., on April 25, 1950, appellant was seen in the doorway of Gracie Hill's house, and was seen leaving there and walking toward Fall Creek.

Police officers testified they were called to the home of Gracie Hill, arriving at about 6:00 a.m., on April 26, 1950; Gracie Hill and the mother of the deceased were there, and they found the body of Louise Woodford lying on a bed, unclothed and uncovered; there was mud on her body, including her face and head; her face and body were covered with bruises, and her face was swollen and discolored; pictures were taken

of the room and of the body, and they showed the exact conditions as found when the police officers entered. The exhibits were then offered and received in evidence.

The dress, coat, shoes, and other personal belongings of the deceased were identified as having been worn by the deceased and as being untorn while the deceased was wearing them. They were in a torn condition, dirty, and muddy. The shoes and part of the dress were found on the creek bank. The coat was wet and muddy and was on the floor at the head of the bed where deceased was found.

The evidence further revealed that at about 3:00 o'clock in the morning of April 26, 1950, appellant came to the home of the mother of the deceased; the nail was taken from the door, and appellant asked that a suit which he had left there be handed out through the door; appellant then went to the home of a relative, burned his clothes, put on others, and from there left for another home, at which place the police officers found him hiding under a bed in the front room. He was placed under arrest, taken to the police station, and, after a preliminary hearing in Municipal Court, Room 4, which his attorney attended, appellant made a voluntary confession. In the vicinity of where some of the deceased's clothing was found, along the bank of Fall Creek, the top surface of the bank had been disturbed, and the same condition existed along the edge of the creek.

There was evidence that an autopsy was performed by a physician and surgeon, revealing that the deceased, Louise Woodford, was approximately thirty-four years of age, five feet, five inches, in height, and weighed approximately one hundred and twenty pounds; the face and body were covered with a layer of dried mud; there were large bruises over both eyes,

over the cheek bones, over the scalp, and especially behind the right ear; the knees and lower part of the legs were covered with small lacerations and bruises, measuring up to four inches in diameter; the lips were lacerated on the inner surfaces and markedly thickened with bruises; there was a small quantity of mucus, with a small amount of muddy material similar to that found on the face, in the trachea; an examination of the abdomen revealed a small amount of blood, apparently coming from small blood vessels which had been torn, caused by a very sharp blow in the pit of the stomach; the scalp was reflected, showing large bruised areas, especially over the right half; there was a small amount of free blood in the spinal fluid; the spinal fluid bathes the brain; on the right side of the brain there was a bruised area in the brain tissue, itself, with some rupture of the blood vessels, which apparently was the source of the hemorrhage, and was due to a very hard blow in the area of the brain; an examination of the skull revealed a separation of the bony junction between the bone of the parietal part of the brain and the bone of the occipital part, which had been exploded apart as the result of a blow received by the deceased prior to her death; all of the injuries were received prior to death; mud mixed with mucus in the lungs indicated that the deceased had attempted to breathe while in mud or under water. The doctor's opinion was that death was caused as a result of multiple injuries to the head and neck, resulting in skull fracture and subarachnoid hemorrhage of the right side of the brain, and drowning. The doctor further testified that, in his opinion, the patient would have survived if she had received medical treatment "in spite of the extent and seriousness of her injuries"; and that, without medical attention, she would probably not survive.

Exhibits 9 and 10 were admitted over objections, Exhibit 9 showing the body of the deceased and Exhibit 10 showing the brain and the injury thereto.

Counsel for the defense, in cross-examination of the doctor, asked the following question:

"And not having received the medical attention, she still need not have died; is that correct?"

The doctor answered:

"Her injuries were very serious and, as you can see on the photographs, she had hemorrhage in the brain, and that particular set of circumstances is pretty critical. If she were not treated at all —miracles do happen—but the chances would be very much against it without proper control of the pressure of the spinal fluid that is caused by the increase of bleeding in the brain."

The evidence further revealed that appellant had an altercation with Louise Woodford on the creek bank, and he estimated he left her about 3:00 a.m., on April 26, 1950. Appellant signed a statement, which disclosed, among other things, that appellant and the deceased, Louise Woodford, had been at the home of Louise Woodford's mother about 7:45 p.m., on April 25th; they left there and went to the home of Gracie Hill, across the street, where they had wine to drink; Louise Woodford left to go to her mother's house; after a while, appellant went to the door and saw the deceased and a man going toward Fall Creek; he watched her for about ten minutes and then walked over to where they were; they were lying on the ground and the man was on top of her; he jumped up and ran down the creek bank; she ran toward the creek and into the water; he pulled her out of the creek; she then professed her love for appellant; he slapped her several times with his left hand; in getting her

out of the water he pulled her coat off completely, and took it to Gracie Hill's house while aiding the deceased; Gracie Hill let them in the house, and asked appellant to lock the door; appellant and the deceased then got into bed together; again they discussed the occurrence, kissed each other and went to sleep; at that time the deceased's face was bruised and her mouth swollen; he awakened around 3:00 o'clock in the morning and tried to awaken the deceased; he shook her, and then found out she was not breathing; he then put on his clothes, asked the landlady where the key was, unlocked the door and went across the street to get his other suit; he then went to a niece's house, and, after discussing the situation with her husband, burned his suit and topcoat in the furnace; he then went to a sister's house, where the police found him. Appellant stated that he was a boxer, and had boxed since he was sixteen years of age, and until 1939, and was forty-four years of age.

As this court has so often stated, we cannot weigh the evidence, but must determine whether there is substantial evidence of probative value from which the jury could reasonably have inferred that appellant was guilty. We therefore look to the evidence, direct and circumstantial, and the inferences to be drawn therefrom, most favorable to the State. *Watts* v. *State* (1950), 229 Ind. 80, 95 N. E. 2d 570; *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769. Since there was circumstantial evidence in this case, we have examined it to ascertain whether an inference might reasonably be drawn from it tending to support the verdict. The rule that circumstantial evidence must be of so conclusive a character, and point so surely and unerringly to the guilt of the accused, as to exclude every reasonable hypothesis of his innocence, is solely for the guidance of trial courts

and juries, and not courts of review. *Christen* v. *State* (1950), 228 Ind. 30, 89 N. E. 2d 445.

Appellant contends that, under the evidence above set out, appellee failed to prove purpose and premeditated malice. These are both questions of fact for the jury. *Stice* v. *State* (1950), 228 Ind. 144, 89 N. E. 2d 915; *Ketring* v. *State* (1936), 209 Ind. 618, 200 N. E. 212; *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192, 72 A. L. R. 891; *Koerner* v. *State* (1884), 98 Ind. 7. The jury had the right to consider all of the circumstances bearing upon the question of premeditated malice, regardless of whether the circumstances occurred before or after the homicide. Malice may be inferred from any deliberate or cruel act by one person against another. *Harris* v. *State* (1900), 155 Ind. 265, 58 N. E. 75; *Lloyd* v. *State* (1934), 206 Ind. 359, 189 N. E. 406; *Koerner* v. *State, supra.* Both purpose and premeditated malice may be proved by prior threats and circumstances. Ewbank's *Indiana Criminal Law* (2d Ed.), §§ 888, 889, pp. 671, 672. In the case now before us, there was direct testimony of a prior threat and a prior assault on the deceased, Louise Woodford. There was evidence, both direct and circumstantial, from which reasonable inferences of purpose and premeditated malice could be drawn by the jury.

Appellant further contends that the *corpus delicti* was not proved. It was necessary for appellee to prove that the specific crime was committed by *some one. Parker* v. *State* (1949), 228 Ind. 1, 88 N. E. 2d 556, 557; *Hunt* v. *State* (1939), 216 Ind. 171, 23 N. E. 2d 681; *Watts* v. *State, supra.* The evidence in the case before us reveals that the deceased had been with appellant during the day and night of April 25, 1950; that in the afternoon he had

threatened the deceased and others with death by burning, and had struck the deceased and knocked her under a table; that the same night he was seen going toward Fall Creek, from which direction the deceased was heard to call her mother, and along which creek the deceased's shoes and part of her torn dress were found; that appellant carried Louise Woodford into the home of one of the witnesses, and placed her nude body on a bed; and that at that time such injuries had been inflicted as would be fatal in nature if not treated; that the deceased's legs, face, and hair were covered with mud; that Louise Woodford was found dead in the bed. The evidence is sufficient to prove the *corpus delicti*. The *corpus delicti* having been proven, it was proper to admit into evidence the admissions and extra-judicial confession of appellant. *Hunt v. State, supra; Watts v. State, supra*. Appellant argues that this case is similar to *Parker v. State, supra*. With this we cannot agree. In the *Parker Case* there was no evidence that Mrs. Johnson was murdered, and no evidence that the bones and skull found were those of Mrs. Johnson, and therefore no proof was made of the *corpus delicti*. It was therefore improper to admit the confession of the accused. In the case now before us, it was proved by direct evidence that the deceased, Louise Woodford, met a violent death at the hands of some one; and, by the extra-judicial confession and admissions, along with all of the other evidence, the jury believed beyond a reasonable doubt that appellant committed and was guilty of the crime charged. There is substantial evidence of probative value upon each material element of the crime charged to support the verdict.

Appellant further contends that certain photographs introduced in evidence were prejudicial. The photo-

graphs showing the body of the deceased, Louise Woodford, and of her injured brain were properly identified as photographs of the deceased. In the case of *Hicks* v. *State* (1938), 213 Ind. 277, 288, 11 N. E. 2d 171, 12 N. E. 2d 501, a photograph of the deceased's head and hands was introduced in evidence, and this court held that, since they were properly identified as the head and hands of the deceased, the photograph was admissible. The trial court committed no error in admitting the photograph of the body of the deceased and of her injured brain. They were admissible in evidence. *Hicks* v. *State, supra; Hawkins* v. *State* (1941), 219 Ind. 116, 37 N. E. 2d 79. Other photographs showing the condition of the ground along the bank of Fall Creek were properly identified and admitted into evidence as exhibits. Witnesses had testified, without objection, to the condition of the ground and as to the very facts which the photographs showed. As was held in *Hawkins* v. *State, supra,* a witness may describe in words what he saw and supplement the same with photographs. A photograph proved to be a true representation of a person, place, or thing which it purports to represent, is competent evidence of anything of which it is competent for a witness to give a verbal description. The photographs were properly admitted into evidence as exhibits. *Hawkins* v. *State, supra.*

Appellant further argued before this court that there was a variance between the indictment and the proof as to the cause of death. The indictment charged, among other things, that appellant "did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder Louise Woodford, a human being, by then and there unlawfully, feloniously, purposely, and with premeditated malice beat-

ing at and against the body of the said Louise Woodford, with his hands, and did then and there and thereby inflict a mortal wound in and upon the body of the said Louise Woodford of which mortal wound the said Louise Woodford then and there and thereby died." The evidence showed, among other things, that the cause of Louise Woodford's death was multiple injuries to the head and neck, resulting in skull fracture and subarachnoid hemorrhage of the right side of the brain, and drowning. Appellant claims that the drowning was not charged, and that this was also a cause of death. Expert testimony revealed that Louise Woodford received the injuries before death, and, as admitted by the admissions and extra-judicial confession of appellant, the deceased was living when appellant carried Louise Woodford into the house of a witness and placed her on a bed. Evidence further revealed that if the deceased, Louise Woodford had received medical treatment immediately, she would have had an opportunity to survive in spite of the extent and seriousness of her injuries, but that without treatment she would not survive. Evidence further revealed that appellant left Louise Woodford on the bed to die.

The case before us is similar to the case of *Hicks* v. *State* (1938), 213 Ind. 277, 11 N. E. 2d 171, 12 N. E. 2d 501, *supra*. In that case the deceased was beaten by several men, but later, while alive, was heard to moan. The accused men then shot the deceased through the head. They were charged by indictment with having beaten the deceased to death. This court held that one who inflicts injury on another is deemed by law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility.

*Hicks* v. *State, supra,* at page 295 of 213 Ind. The reasoning applies to the case now before us. In this case, as in that case, there was ample evidence from which the jury could infer that the beating administered to the deceased contributed mediately or immediately to her death. There is no variance in the proof.

Finding no reversible error, the judgment is affirmed.

NOTE.—Reported in 98 N. E. 2d 671.