Harry W. GRAHAM and Ellen Graham,
Defendants-Appellants,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 2–984A274 [1]

Court of Appeals of Indiana,
First District.

July 31, 1985.

Rehearing Denied Sept. 18, 1985.

**1.** This case was diverted to the First District
from the Second District by order of the Chief
Judge.

Jerrald A. Crowell, Bowman, Crowell & Teeters, Fort Wayne, for defendants-appellants.

Linley E. Pearson, Atty. Gen. of Ind., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

RATLIFF, Presiding Judge.

## STATEMENT OF THE CASE

Harry W. Graham and Ellen Graham were each charged with involuntary manslaughter,[2] reckless homicide,[3] and unlawful practice of medicine.[4] Guilty verdicts were returned on all counts. The Delaware Superior Court subsequently entered convictions on the reckless homicide and unlawful practice of medicine counts and sentenced each defendant to two concurrent three year terms and fines of $5,000.00. We affirm.

## FACTS

In February or March of 1983 Sybil Bennett developed a lump on one of her breasts. She apparently consulted briefly with a physician concerning the growth. Fearing, however, that she would be forced to undergo a mastectomy, she sought the aid of two members of her church, Harry and Ellen Graham, neither of whom were physicians.

The Grahams are, as was Sybil, devout Seventh Day Adventists. As·such, they follow the teachings of Ellen G. White, a prophet of the Seventh Day Adventist Church. Sister White advocated the use of herbs and other natural substances to assist God in healing the infirm. She also exhorted the internal and external application of pure water. Although the church

2. Indiana Code section 35–42–1–4.

3. Indiana Code section 35–42–1–5.

4. Indiana Code section 25–22.5–8–1.

itself does not encourage its members to reject medical care, Ellen White's writings discredit the use of modern drugs.

In furtherance of these theories, the Grahams established the "Hoosier Health House" in Delaware County, Indiana. This business catered primarily to those seeking a naturopathic form of health care. The Grahams also sold minerals, vitamins, health food and equipment for processing health food. Additionally, Hoosier Health House offered numerous publications which advocated "natural" cures to various diseases including cancer.

On June 2, 1983, Sybil went to the Hoosier Health House complaining of pain behind her eyes, a chronic cough, and physical weakness. After a preliminary examination, which included urine and saliva tests, Harry devised a program to treat Sybil's ailments. This program included nutritional supplements, fomentations,[5] enemas, and colonic irrigations.[6] On some days, the Grahams gave Sybil as many as eleven enemas employing coffee, carrot juice, aloe vera, castor oil, or pure water. In spite of these treatments Sybil's health did not improve.

Sometime later, Sybil, who was spending the majority of her time at the Hoosier Health House, showed the Grahams the lesion which had developed on her breast. Ellen, a registered nurse, immediately recognized that Sybil was potentially suffering from breast cancer. At Sybil's request, Harry set up an appointment to see Dr. David D. Goldberg in Dayton, Ohio.[7] After conducting a biopsy, Dr. Goldberg concluded that Sybil was in fact suffering from breast cancer. He prescribed the drug Laetrile for Sybil and instructed Ellen to administer the injections. The Grahams

also continued to give Sybil nutritional supplements, enemas, and colonic irrigations.

During Sybil's stay at the Hoosier Health House, her husband Jack often urged her to seek traditional medical care. Sybil, however, refused to entertain this prospect despite her deteriorating condition. On several occasions, when Jack made his pleas for Sybil to accept conventional treatment, Ellen told Sybil that "they would just cut you up." Record at 375.

Despite the Graham's multifarious efforts, Sybil's physical condition continued to decline. Finally, on August 24, 1983, Jack Bennett and a family friend, Gail Heiland, took Sybil to see Dr. Robert Suer. Sybil was so weak by this time that Dr. Suer had to examine her in the backseat of the Bennett's automobile. He found that Sybil was having respiratory distress and was slipping in and out of consciousness. Dr. Suer had Jack rush Sybil to Ball Memorial Hospital.

When she arrived at the hospital, Sybil was immediately placed on a respirator. Initially, she was treated for heart failure,[8] lung cancer, sepsis and the breast cancer which by this time had metastatized to the lung. Sybil also suffered from a lack of oxygen in her blood, pulmonary edema, and an electrolyte imbalance. It was clear to her attending physicians that Sybil's only chance for survival was chemotherapy. However, because of Sybil's critically weakened physical condition, her doctors determined that she could not survive the administration of these potent drugs. Therefore, they were forced to let the cancer run its course.

On September 11, 1983, Sybil Bennett died. The immediate cause of death was respiratory failure. This was, of course, occasioned by the untreated breast cancer

---

5. A fomentation is a hot or cold compress applied to the skin to stimulate circulation.

6. A colonic irrigation is similar to an enema. The procedure involves the introduction of pressurized water into the colon.

7. Dr. Goldberg is an osteopathic physician licensed in Ohio. He is not, however, licensed in Indiana.

8. Dr. Suer felt that the heart failure may have resulted from the toxic levels of potassium contained in Sybil's system. As part of the nutritional program they designed for Sybil, the Grahams administered potassium.

and promoted by her weak state of health. Subsequently, the Grahams were charged in connection with Sybil's death.

### ISSUES

On appeal, the Grahams raise eight issues for our consideration. Rephrased and reordered, those issues are:

1. Whether the search warrant authorizing the search of the Hoosier Health House and the Grahams' residence was valid.

2. Whether the trial court erred when it refused to sever the charges.

3. Whether the definition of the practice of medicine contained in Indiana Code section 25–22.5–1–1.1(a) (Burns 1982) is unconstitutionally vague.

4. Whether the trial court correctly instructed the jury on reckless homicide and involuntary manslaughter.

5. Whether the trial court erred in refusing to give several of the Grahams' tendered instructions.

6. Whether the trial court admitted evidence at variance from the charges.

7. Whether the trial court committed reversible error when it admitted certain evidence which the Grahams now contend was irrelevant and unduly prejudicial.

8. Whether the Grahams' convictions are supported by sufficient evidence.

### DISCUSSION AND DECISION

*Issue One*

During the course of the investigation into Sybil Bennett's death, a search warrant was issued authorizing a search of the Grahams' home and the Hoosier Health House. That warrant was based, to a certain degree, on the hearsay statements of Jack Bennett and Gail Heiland.[9] The defendants now assert that there was no testimony establishing either the hearsay declarants' credibility or a factual basis for

the information they provided. Consequently, the Grahams opine that the trial court erred in overruling their motion to suppress and in subsequently admitting into evidence items seized pursuant to the search warrant.

The issuance of search warrants in Indiana is controlled largely by statute. At the time of the probable cause hearing at issue here, Indiana Code section 35–33–5–2(a) provided, in relevant part, that "[w]hen based on hearsay, the affidavit shall contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished." Such information is also required when a judicial hearing is used in lieu of an affidavit. Indiana Code section 35–33–5–2(c).

■ Contrary to the Grahams' arguments, the requirements of the statute were met here. The facts introduced at the probable cause hearing established the credibility of Jack Bennett and Gail Heiland. They were not paid informants. Rather, they were cooperative citizens aiding an ongoing criminal investigation of conduct they had witnessed. *Pawloski v. State* (1978), 269 Ind. 350, 354, 380 N.E.2d 1230, 1232 (examining the significance of this distinction). The credibility of these informants was, under the circumstances, sufficiently established. *See Baker v. State* (1983), Ind., 449 N.E.2d 1085, 1091; *Wells v. State* (1979), Ind.App., 397 N.E.2d 1250, 1257, *trans. denied;* 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.4(a) (1978) [hereinafter cited as 1 W. LaFave]. Evidence presented at the hearing also established that there was a factual basis for the information provided by Jack and Gail. They had been at the Hoosier Health House and witnessed some of the conduct which was being investigated. This was sufficient to establish that the hearsay informants, Jack and Gail, were speaking from first-hand

---

**9.** The search warrant was issued following a hearing held pursuant to Indiana Code section 35–33–5–2 (1982). An Indiana State Police officer, First Sergeant Richard McCord, was the sole witness at that hearing.

knowledge. That is all that is required. 1 W. LaFave, *supra*, at § 3.4(b). Consequently, the search warrant was valid and the trial court did not err in admitting evidence discovered during the execution of that warrant.

*Issue Two*

■ The Grahams next maintain that the trial court erred when it denied their motion to sever the charges. In making such a determination, the trial court is guided by statute. Indiana Code section 35–34–1–11(a) (Burns Supp.1984) states:

"(a) Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:

(1) the number of offenses charged;
(2) the complexity of the evidence to be offered; and
(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense."

Consequently, when two or more charges are joined for trial solely on the ground that they are of the same or similar character, the defendant may demand severance. In all other cases, however, the severance determination is firmly committed to the trial court's discretion. *Eubank v. State* (1983), Ind., 456 N.E.2d 1012, 1017; *Willard v. State* (1980), 272 Ind. 589, 596, 400 N.E.2d 151, 156. These latter cases require the trial court to determine whether, considering the statutory factors, severance will "promote a fair determination of the defendant's guilt or innocence." We will reverse only when clear error in making that determination is established. *Eu-*

*bank*, at 1017. In the present case, the charges filed against the Grahams were not joined simply because they were of the same or similar character. Therefore, we will reverse only if the Grahams demonstrate that the trial court clearly erred when it denied their motion to sever.

■ Here, as in *Smith v. State* (1984), Ind., 465 N.E.2d 1105, 1120–21, it was appropriate to join all charges for a single trial. The Grahams were each charged with involuntary manslaughter, reckless homicide, and unlawful practice of medicine. All of these charges resulted from a single course of conduct, the Grahams' treatment of Sybil Bennett. Thus, the evidence presented at trial to support one charge was relevant to the other charges as well. In these circumstances, it cannot be said that the evidence or legal principles were so complex and confusing that the jury would be incapable of fairly determining the defendants' guilt or innocence on each charge. *See e.g., Smith*, at 1121; *Douglas v. State* (1984), Ind., 464 N.E.2d 318, 320; *Eubank*, at 1017; *Willard*, 272 Ind. at 596, 400 N.E.2d at 156.

This case is unlike *Duncan v. State* (1980), 274 Ind. 144, 409 N.E.2d 597. In that case, the defendant was charged with conspiracy to commit a felony and possession of burglar tools by a convicted felon. An element of the possession charge was proof of a prior felony conviction. The prior felony conviction upon which this charge was based was burglary. Consequently, admission of that prior conviction would have been clearly improper in the trial of the conspiracy charge. Our supreme court concluded, therefore, that the defendant's motion to sever the two charges should have been granted. *Id.*, at 600. The case at bar presents a far different situation. As we noted above, all of these charges related to a single course of conduct. Thus, contrary to the Grahams' arguments on appeal, all of the evidence presented during the instant trial would have been admissible in separate trials of each charge. The denial of the Grahams'

motion to sever was not, therefore, reversible error.

*Issue Three*

As we have already indicated, the Grahams were each charged with the unlawful practice of medicine.[10] Indiana Code section 25–22.5–1–1.1(a) (Burns 1982) defines the practice of medicine as:

"(1) Holding oneself out to the public as being engaged in the diagnosis, treatment, correction or prevention of any disease, ailment, defect, injury, infirmity, deformity, pain or other condition of human beings, or the suggestion, recommendation or prescription or administration of any form of treatment, without limitation, or the performing of any kind of surgical operation upon a human being, including tattooing, or the penetration of the skin or body orifice by any means, for the intended palliation, relief, cure or prevention of any physical, mental or functional ailment or defect of any person;

(2) The maintenance of an office or place of business for the reception, examination or treatment of persons suffering from disease, ailment, defect, injury, infirmity, deformity, pain or other conditions of body or mind; or

(3) Attaching the designation 'doctor of medicine,' 'M.D.,' 'doctor of osteopathy,'; 'D.O.,' 'osteopathic medical physician,' 'physician,' 'surgeon,' or 'physician and surgeon,' either alone or in connection with other words, or any other words or abbreviations to his name, indicating or inducing others to believe that the person is engaged in the practice of medicine or osteopathic medicine as herein defined."

The Grahams opine that this statutory definition is unconstitutionally vague. Consequently, they assert, the trial court should have dismissed the unlawful practice of medicine counts. We disagree.

10. Indiana Code section 25–22.5–8–1 (Burns 1982) provides:
"Unlawful practice.—It is unlawful for any person to practice medicine or osteopathic

■ Due process requires that statutory prohibitions be clearly defined. *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227. Enactments need not be drawn with mathmatical certainty. However, a statute "forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." *Grody v. State* (1972), 257 Ind. 651, 653, 278 N.E.2d 280, 281 *quoting Baggett v. Bullitt* (1964), 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377. *See also Wilson v. State* (1984), Ind., 468 N.E.2d 1375, 1377; *Wallman v. State* (1981), Ind.App., 419 N.E.2d 1346, 3149. The reasons for this constitutional requirement are self-evident. Vague laws do not afford the innocent fair warning of what conduct is subject to penal sanctions. They also invite arbitrary enforcement. Finally, when a vague statute abuts one of the rights enumerated in the First Amendment it inhibits the exercise of that fundamental freedom. *Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2299, 33 L.Ed.2d at 227–28. These concerns are not implicated by the statute at issue here however. The practice of medicine definition explicitly delineates what conduct is proscribed. Therefore, it does not offend due process.

In their briefs to this court, the Grahams set out a number of examples of conduct which they contend could constitute the practice of medicine. They conclude, presumably, that because such conduct should not be subject to criminal liability that the statute is vague. As the State correctly points out, however, that is not the test we must employ. Rather, we must determine whether the statute adequately informs people of ordinary intelligence what conduct is proscribed. *McNeely v. State* (1979), 181 Ind.App. 238, 240, 391 N.E.2d 838, 840, *trans. denied.* We have already determined that it fulfills that requirement. *See State v. Horn* (1966), 4 Ariz.App. 541,

medicine in this state without holding a license or permit to do so, as provided in this article."

422 P.2d 172 (holding similarly worded statute not unconstitutionally vague). Consequently, the trial court committed no error when it overruled the Grahams' motion to dismiss.

*Issue Four*

The Grahams also contend that the trial court erred when it instructed the jury on involuntary manslaughter and reckless homicide. Specifically, the Grahams have challenged five of the trial court's final instructions on various grounds.[11] They have, however, waived appellate consideration of all but one of these arguments.

■ Initially, we note that the Grahams' objections at trial to Final Instruction 24, 25, and 26 were that: (1) they were not the law of Indiana, (2) there was no evidence to support the giving of Final Instructions 25 and 26, and (3) Final Instructions 24 and 26 were at variance from the charges. Such bare objections are wholly inadequate to preserve any error occasioned by the giving of these instructions however. Indiana Rules of Procedure, Trial Rule 51(C); *see also Whitten v. State* (1975), 263 Ind. 407, 413, 333 N.E.2d 86, 91; *Nationwide Mutual Insurance Co. v. Neville* (1982), Ind.App., 434 N.E.2d 585, 600, *trans. denied.* In addition, the Grahams argued only one specific issue in their Appellants' Brief. Consequently, that is the only issue we may consider on appeal. *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127, 131 n. 3. In their Reply Brief, the Grahams did raise additional arguments. However, even if parties were permitted to raise new issues in their Reply Brief, we would not be able to consider those raised by the Grahams. Their Reply Brief contains only bald assertions relative to the

new issues raised. This failure to present cogent legal argument or citation to pertinent authority results in waiver of appellate consideration. *See Lenard v. Adams* (1981), Ind.App., 425 N.E.2d 211, 218; Indiana Rules of Procedure, Appellate Rule 8.3(A). Therefore, we now turn to the sole allegation of error preserved by the Grahams.

In its instructions, the trial court informed the jury of the causation requirements .of both reckless homicide and involuntary manslaughter. Final Instruction 21 stated:

"In a prosecution for Involuntary Manslaughter or Reckless Homicide, the State must prove to you beyond a reasonable doubt, *that the defendants, or either of them; did an act or acts, which caused or contributed mediately or immediately to her death.*

In other words, before you can find the defendants, or either of them guilty of either Involuntary Manslaughter or Reckless Homicide, *you must find the act or acts of the defendant or defendants was a direct and proximate cause of the death of Sybil Bennett.* [Emphasis supplied.]"

Record at.293. The Grahams argue that this instruction incorrectly stated the law. They contend that in order to prove homicide, the state must show that the defendants "inflicted or caused to be inflicted an injury upon the victim which was a direct and proximate cause of death." Brief for Appellants at 32–33. The Grahams have misinterpreted Indiana law.

■ Appellants refer us to a number of Indiana cases which do essentially state

---

**11.** The final instructions challenged here were numbered 21, 23, 24, 25, and 26. In Final Instruction 21, the trial court set out the causation requirement for both reckless homicide and involuntary manslaughter. Final Instruction 23 informed the jury that consent was not a defense to a homicide prosecution. Also, Final Instruction 24 essentially stated that a person who seeks to cure those who are, because of their illness, susceptible to such claims, cannot escape the consequences of his gross ignorance of accepted medical procedures. Final Instruc-

tion 25 set out four situations in which the law imposes a duty to act. The last instruction challenged by the Grahams, Final Instruction 26, provided that where an individual knows that another is in need of proper medical attention, but induces the other to forgo such treatment in favor of his or her own methods, and thereby shortens the life of the other, has proximately caused that person's death. This instruction also defined homicide as the shortening of human life.

that a homicide occurs when the defendant inflicted or caused to be inflicted an injury which contributed mediately or immediately to the victim's death. *See Miller v. State* (1975), 263 Ind. 595, 598, 335 N.E.2d 206, 208; *Wahl v. State* (1951), 229 Ind. 521, 533, 98 N.E.2d 671, 676; *Hicks v. State* (1937), 213 Ind. 277, 295, 11 N.E.2d 171, 179, *cert. denied* 304 U.S. 564, 58 S.Ct. 951, 82 L.Ed. 1531; *Gibbs v. State* (1981), Ind.App., 426 N.E.2d 1150, 1154; *Reed v. State* (1979), 180 Ind.App. 5, 8–9, 387 N.E.2d 82, 84. In these cases, however, the defendants had in fact inflicted injuries directly on their victims. Therefore, it was appropriate for the court to discuss the causation requirement in those terms. In order to sustain its burden in homicide prosecutions of establishing causation, though, the state need only show that the defendant's conduct contributed mediately or immediately to the death of another person. *Powell v. State* (1982), Ind., 437 N.E.2d 969, 971; *State v. Kelsey* (1975), 163 Ind.App. 543, 545, 325 N.E.2d 218, 219; *Coffelt v. State* (1974), 159 Ind.App. 485, 490, 307 N.E.2d 497, 500, *quoting Votre v. State* (1923), 192 Ind. 684, 686, 138 N.E. 257, 257; W. LaFave & A. Scott, *Criminal Law* § 35 (1972); C. Torcia, *Wharton's Criminal Law* § 26 (14th ed. 1978); 40 Am.Jur.2d *Homicide* § 13 (1968); 40 C.J.S. *Homicide* § 11 (1944). This is precisely what Final Instruction 21 required. Consequently, it was a correct statement of the law and properly given.

 Finally, the Grahams argue that the trial court erred when it refused to give their second tendered instruction. That instruction stated:

"In a prosecution for involuntary manslaughter or reckless homicide, the State must prove to you beyond a reasonable doubt that the defendants, or either of them, inflicted, or caused to be inflicted an injury upon the victim which contributed mediately or immediately to her death. In other words, before you can find the defendants, or either or them, guilty of either reckless homicide or in-

voluntary manslaughter, you must find that the State has proven beyond a reasonable doubt that the defendants, or either of them, were engaged in unlawful conduct which inflicted or caused to be inflicted an injury upon Sybil Bennett and that the injury was a direct and proximate cause of the death of Sybil Bennett."

Supp. Record at 14. As with most of the other issues raised in this section of their Appellants' Brief, the Grahams have waived appellate consideration of this argument because of their failure to make a cogent legal argument and cite to pertinent authority. Even if this issue had been properly preserved, however, the Grahams would not be entitled to a reversal of their convictions. No error occurs in refusing an instruction if its subject matter is sufficiently covered by instructions actually given. *Weekley v. State* (1981), Ind.App., 415 N.E.2d 152, 155. Final Instruction 21 covered the same subject matter as the instruction tendered by the Grahams. Therefore, the trial court committed no error in refusing to give their tendered instruction.

*Issue Five*

 Appellants also assert that the trial court erred in refusing to give several of their tendered instructions which were based on the Indiana Nurse Licensing Statute.[12] In order to determine whether error results from the trial court's refusal to give a tendered instruction, we must consider whether: (1) the tendered instruction correctly states the law, (2) there is evidence in the record to support the giving of the instruction, and (3) the substance of the instruction is adequately covered by other instructions which were actually given by the trial court. *Van Orden v. State* (1984), Ind., 469 N.E.2d 1153, 1161, *cert. denied* — U.S. ——, 105 S.Ct. 2335, 85 L.Ed.2d 851; *Davis v. State* (1976), 265 Ind. 476, 478, 355 N.E.2d 836, 838. Application of this three-step analysis to the record now before us leads inescapably to the conclu-

12. Indiana Code section 25–23–1–1 *et seq.* (Burns 1982).

sion that no error resulted from the refusal of the Grahams' tendered instructions.

The Grahams' tendered instructions numbers 3 and 4 were based on Indiana Code sections 25–23–1–27.1(b)(5), (6) (Burns 1982). Those sections provide in relevant part:

"(b) This chapter does not prohibit:

(5) The gratuitous care of sick, injured, or inform [infirm] individuals by friends or the family of that individual;

(6) The case of the sick, injured, or infirm in the home for compensation if the person assists only:

(A) With personal care;

(B) In the administration of a domestic or family remedy; or

(C) In the administration of a remedy that is ordered by a licensed health professional and that is within the scope of practice of the licensed health professional under Indiana law;"

These sections delineate certain conduct which is not regulated by the Nurse Licensing Statute. The Grahams were not charged with the unlawful practice of nursing, however. Consequently, the tendered instructions are not applicable to or supported by the facts in the record. No error occurred, therefore, when the trial court refused to give these tendered instructions. *See McDonald v. State* (1975), 264 Ind. 477, 480, 346 N.E.2d 569, 572; *Finton v. State* (1963), 244 Ind. 396, 403, 193 N.E.2d 134, 138; *Layne v. State*·(1975), 164 Ind.App. 486, 495, 329 N.E.2d 612, 619, *trans. denied;* 8A I.L.E. *Criminal Law* §§ 551–552 (1971).

■■■ The trial court also refused the Grahams' tendered instruction number 5. That instruction stated:

"The defendant Ellen Graham has raised the defense that she was not engaged in the unlawful or unauthorized practice of medicine because she was a registered nurse practicing her profession. At all times in question there was in full force and effect a statute of the State of Indiana which provided in pertinent part as follows:

'25–22.5–1–2. *Exclusions*—This article insofar as it relates to the unlawful or unauthorized practice of medicine or osteopathic medicine shall not apply:

. . . .

(k) To any nurse practicing his profession under I.C. 25–23 . . .'

"I.C. 25–23–1–1 defines registered nurse as follows:

'. . .

(b) The term "registered nurse" means a person who holds a valid license pursuant to the terms of this chapter, and who bears primary responsibility and accountability for nursing practices based on specialized knowledge, judgment and skill derived from the principles of biological, physical and behavioral sciences. The registered nurse practices in the profession of nursing by the performance of those activities which include but are not limited to:

(1) Identifying human responses to actual or potential health conditions;

(2) Deriving a nursing diagnosis which identifies the needs of the individual and/or family;

(3) Executing a nursing treatment regimen through the selection, performance and management of nursing interventions based on the nursing diagnosis;

(4) Teaching health care practices;

(5) Advocating the provision of health care services through collaboration with other health service personnel;

(6) Executing regimens as prescribed by a physician with an unlimited license to practice medicine or osteopathic medicine, or a licensed chiropractor, dentist, optometrist, or podiatrist;

(7) Administering, supervising, delegating and evaluating nursing activities; and

(8) Performing nursing acts which are approved by the Indiana State Board of Nurses' Registration and Nursing Education, or medical acts which are approved by the Indiana

State Board of Nurses' Registration and Nursing Education and the Medical Licensing Board;'

"Also in effect at the time the alleged offense was committed is *I.C.* 25–23–1–1.1 which reads as follows:

'(a) In lieu of the definition of "registered nurse" set out in section 1[25–23–1–1] of this chapter, as used in this chapter, "registered nurse" means a person who holds a valid license pursuant to the terms of this chapter, and who bears primary responsibility and accountability for nursing practices based on specialized knowledge, judgment and skill derived from the principles of biological, physical and behavioral sciences.

'(b) As used in this chapter:

(1) "Registered nursing" means performance of services which include, but are not limited to:

(A) Assessing health conditions;

(B) Deriving a nursing diagnosis;

(C) Executing a nursing regimen through the selection, performance, and management of nursing actions based on nursing diagnoses;

(D) Advocating the provision of health care services through collaboration with or referral to other health professionals;

(E) Executing regimens delegated by a physician with an unlimited license to practice medicine or osteopathic medicine, a licensed dentist, a licensed chiropractor, a licensed optometrist, or a licensed podiatrist;

(F) Teaching, administration, supervising, and evaluating nursing practice;

(H) Performing acts which are approved by the board or by the board in collaboration with the board of medical registration and examination in Indiana.

(2) "Assessing health conditions" means the collection of data through such means as interview, observation, and inspection for the purpose of:

(A) Deriving a nursing diagnosis;

(B) Indentification of need for additional data collection by nursing personnel; and

(C) Identification of need for additional data collection by other health professionals.

(3) "Nursing regimen" means preventive, restorative, maintenance, and promotion activities which include, but are not limited to, meeting or assisting with self-care needs, counseling, and teaching.

'(c) In lieu of the definition of "nursing diagnosis" set out in section 1 of this chapter, as used in this chapter "nursing diagnosis" means the identification of needs which are amenable to nursing regimen.'

"If you find that the State has not proven beyond a reasonable doubt that at the time of the alleged offense the defendant Ellen Graham was not a nurse practicing her profession in accordance with the nursing statute, then you should find the defendant Ellen Graham not guilty of the unlawful practice of medicine."

Supp. Record at 17–19. As the Grahams correctly point out, they are entitled to an instruction on any defense which has some foundation in the evidence presented at trial, even if that evidence is weak and inconsistent. *Harrington v. State* (1980), Ind. App., 413 N.E.2d 622, 624, *trans. denied.* We turn then to a discussion of the evidence relevant to this defense.

During their treatment of Sybil Bennett, the Grahams performed various procedures including enemas, colonic irrigations, pulmentations, and Laetrile injections. At no time did they act under the supervision of a physician licensed to practice medicine in Indiana. Ellen did testify that fomentations, even when not done pursuant to a doctor's orders, were part of the common practice of nursing. However, the Grahams point to no evidence that Ellen's other conduct constituted the practice of nursing. There was no evidence presented that a nurse, in practicing his or her profession, could administer Laetrile

injections, colonic irrigations, or enemas unless authorized to do so by a doctor licensed in this state. Consequently, the trial court properly refused appellants' tendered instruction 5.

*Issue Six*

The next issue raised by the Grahams concerns alleged variances. At trial, the state was permitted to introduce evidence that the Grahams conducted urine and saliva tests on Sybil. The state was also allowed to present evidence of the potential for serious harm occasioned by the introduction of water under pressure into the colon during colonic irrigation. During its case-in-chief, the state also introduced billing statements which detailed the services provided to Sybil and the charges for those services. Finally, the state was able to introduce evidence that the Grahams were charging other individuals for services similar to those provided Sybil. The Grahams now contend that this evidence was at variance from the charges originally filed against them. This argument is, however, without merit.

■ A variance occurs when there is a difference between the crime charged and the proof adduced at trial. *Madison v. State* (1955), 234 Ind. 517, 531, 130 N.E.2d 35, 41; 15 I.L.E. *Indictments and Affidavits* § 102 (1959); 41 Am.Jur.2d *Indictments and Informations* § 260 (1968). Therefore, when the charging papers allege that the defendant stole a white horse and the proof at trial establishes that the defendant in fact stole a black horse, a variance exists. *McCallister v. State* (1940), 217 Ind. 65, 68, 26 N.E.2d 391, 392. The Grahams, though, point to no such variance here. They complain rather, that in addition to the evidence admitted which directly supported the charges against them, evidence of acts not specifically alleged in the information was improperly introduced. In other words, the Grahams claim that a variance occurred because they were charged with the theft of the white horse and at trial the state, in addition to proving that they stole the white horse, also introduced evidence that they stole the black horse. The more appropriate objection in these circumstances would be one based on materiality, relevance or undue prejudice. *See United States v. Tandaric* (7th Cir. 1945), 152 F.2d 3, 6, *cert. denied* 327 U.S. 786, 66 S.Ct. 703, 90 L.Ed. 1012. The Grahams have failed to establish that a variance existed between the crime charged and the proof made at trial.

■ The evidence which the Grahams challenge here was in fact properly admitted. Initially, the billing statements specified the services which the Grahams had provided Sybil. Hence, they were direct evidence of the acts with which the Grahams were charged. In addition, the testimony regarding the potential for serious harm from colonic irrigation tended to show the reckless nature of the Grahams' conduct. Therefore, it was relevant particularly to the reckless homicide charges. *See Hare v. State* (1984), Ind., 467 N.E.2d 7, 17 (defining relevance). The trial court also properly admitted evidence that the Grahams conducted tests on Sybil's urine and saliva despite the fact that they were not charged for those acts. The tests were performed during the Grahams' treatment of Sybil. Thus, this evidence was admissible as part of the *res gestae*. *Cary v. State* (1984), Ind., 469 N.E.2d 459, 462; *Beasley v. State* (1983), Ind., 452 N.E.2d 982, 984; *Daugherty v. State* (1984), Ind. App., 466 N.E.2d 46, 53, *trans. denied*. Finally, we agree with the Grahams' contention that evidence of crimes not charged is generally inadmissible. *See Mason v. State* (1984), Ind., 467 N.E.2d 737, 739. However, such evidence is admissible to show intent, motive, purpose, identification, or a common scheme or plan. *Hare*, at 18; *Mason*, at 739; *Hill v. State* (1983), Ind., 445 N.E.2d 994, 995. Therefore, the evidence which tended to show that the Grahams were charging other individuals for services similar to those performed for Sybil was also clearly admissible.

*Issue Seven*

The Grahams also raise a second contention which is closely related to the issue of

variance. At trial, the court admitted certain evidence over the Grahams' objections. The evidence challenged here includes the evidence which the Grahams contended was at variance with the charges. In addition, they objected to the definition of quackery elicited during the state's cross examination of one of the Grahams' witnesses. Finally, the Grahams also challenged testimony and photographic evidence which depicted the condition of the Hoosier Health House on September 30, 1983, more than one month after Sybil last received treatment at the Grahams' establishment.[13] They assert on appeal that this evidence was irrelevant and unduly prejudicial. Consequently, their argument continues, the trial court erred in admitting it. Even if we were to assume, however, that the trial court's various evidentiary rulings were in error, the Grahams would not be entitled to a new trial.

■ Errors in the admission of evidence will not entitle a defendant to reversal unless he or she can demonstrate that the alleged errors resulted in some significant harm. *Watkins v. State* (1984), Ind., 460 N.E.2d 514, 515; *Groves v. State* (1983), Ind., 456 N.E.2d 720, 723; *Hudak v. State* (1983), Ind.App., 446 N.E.2d 615, 618. Thus, the burden was clearly on the Grahams to establish the existence of prejudice. In their briefs to this court, however, they merely assert that the allegedly erroneous admission of this evidence substantially prejudiced their rights citing *Cox v. State* (1981), Ind.App., 422 N.E.2d 357, *trans. denied*, and *Otto v. State* (1980), Ind.App., 398 N.E.2d 716, *trans. denied.* The Grahams have failed to make any cogent argument which specifically explains how these alleged errors resulted in significant prejudice. Therefore, we must conclude that any error which might have occurred as a result of the admission of this evidence does not warrant reversal.

13. This evidence was gathered during the execution of the search warrant which occurred on

*Issue Eight*

Finally, the Grahams assert that there was insufficient evidence to support their convictions. When presented with an attack on the sufficiency of the evidence, our appellate review is necessarily limited. We will neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we will look only to the evidence which supports the verdict and the reasonable inferences which can be drawn from that evidence. If there is substantial evidence of probative value to support the defendant's conviction it will be affirmed. *McMillian v. State* (1983), Ind., 450 N.E.2d 996, 999; *Joy v. State* (1984), Ind.App., 460 N.E.2d 551, 556. Application of these standards to the facts contained in the record now before us, leads us to conclude that there was in fact sufficient evidence presented to support each of the Grahams' convictions.

Initially, the Grahams argue that there is no evidence to support their convictions for the unlawful practice of medicine. They assert that these convictions were based in large part on evidence seized pursuant to an invalid warrant. Consequently, they opine, when that evidence is excluded, there is insufficient evidence to support these convictions. We have already determined, however, that the challenged warrant was valid. Thus, the evidence seized during its execution was not subject to exclusion.

■ The evidence presented at trial clearly supported the Grahams' convictions for the unlawful practice of medicine. Neither Harry nor Ellen were licensed physicians. However, they examined Sybil, diagnosed her condition, and prescribed a course of treatment. That treatment included administration of Laetrile injections, fomentations, enemas, and colonic irrigations. This court recently held that conduct similar to that engaged in by the Grahams constituted the practice of medicine. *See State ex rel. Medical Licensing*

September 30, 1983.

*Board v. Stetina* (1985), Ind.App., 477 N.E.2d 322, 326–27 (transfer pending). Therefore, there was sufficient evidence to support their convictions.

In addition, the Grahams challenge their convictions for reckless homicide.[14] The crime of reckless homicide is defined by Indiana Code section 35–42–1–5 (Burns 1985) as follows: "Reckless homicide.—A person who recklessly kills another human being commits reckless homicide, a class C felony." Therefore, to sustain the Grahams' convictions for reckless homicide, there must be some evidence of probative value establishing that the Grahams engaged in reckless conduct which resulted in the death of Sybil Bennett. *See Taylor v. State* (1983), Ind.App., 457 N.E.2d 594, 597, n. 6. Such evidence was presented here.

The Grahams practiced medicine on Sybil Bennett despite the fact that neither was licensed by the State of Indiana to do so. Following their diagnosis of Sybil's condition, they prescribed and carried out a course of treatment which included the penetration of Sybil's body and the introduction, into her body, of various substances. The state presented uncontradicted evidence that these treatments robbed Sybil of essential fluids and ultimately created an electrolyte imbalance. In fact, by the time Sybil was admitted to the hospital, the treatments had so seriously weakened her system that she was physically unable to undergo the chemotherapy which could have extended her life. As a result, Sybil died from complications attendant to the untreated breast cancer. This is sufficient evidence that the Grahams engaged in reckless conduct which caused the death of another human being.

Essentially, the Grahams assert that there is no evidence to support their convictions for reckless homicide because the state failed to establish that they inflicted any injury on Sybil which was the direct and proximate cause of her death. However, as we pointed out in our discussion of *Issue Four,* in a homicide prosecution, the state is only required to show that the defendant's conduct contributed mediately or immediately to the death of another person. As our immediately preceding discussion makes clear, the state met its burden of establishing causation in this case.

Finding no reversible error, the trial court is in all things affirmed.

NEAL and ROBERTSON, JJ., concur.

---

14. The trial court did not enter judgment of conviction on the involuntary manslaughter charges even though the jury returned guilty verdicts on those charges. Consequently, it is unnecessary to specifically discuss the evidence presented in relation to those charges here.