MICHAEL COVINGTON v. STATE OF INDIANA.

[No. 174S25. Filed February 11, 1975.
Rehearing denied March 26, 1975.]

*Frank E. Spencer,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *John D. Meyers,* Deputy Attorney General, for appellee.

PRENTICE, J.—Defendant (Appellant) was charged with murder in the first degree and convicted in a trial by jury of murder in the second degree and sentenced to imprisonment for an indeterminate term of not less than fifteen [15] nor more than twenty-five [25] years under the statute.[1]

The sufficiency of the evidence was challenged by several motions and a tendered instruction which would have withdrawn the issue of murder in the second degree from the jury and, in effect, discharged the defendant upon such offense.

The victim of the homicide was the defendant's two-month-old daughter. Evidence of numerous physical abuses of the child by the defendant are not disputed, but counsel contends that there was not sufficient evidence to sustain a finding that an injury or injuries inflicted by the defendant caused the death and, in the alternative, that there was not sufficient evidence that the injuries inflicted by the defendant were inflicted with the statutorily requisite purpose and malice. These are factual considerations to be determined and reviewed in accordance with established rules. The following, although quoted from the dissenting opinion in *Hutchinson* v. *State* (1967), 248 Ind. 226, 240, 225 N.E.2d 828, cited by the appellant, succinctly summarizes the governing axioms:

---

1. Burns Ind. Ann. Stat. § 10-3404. (IC 35-1-54-1) Murder—Second Degree.—Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life, or shall be imprisoned in the state prison not less than [15] nor more than twenty-five [25] years. [Acts 1905, ch. 169, § 350, p. 584; 1969, ch. 95, § 1, p. 214.]

"All the above are questions of fact for the jury. Baker v. State (1964), 245 Ind. 129, 195 N.E.2d 91; Wahl v. State (1951), 229 Ind. 521, 98 N.E.2d 671. The leading case of Baker v. State (1956), 236 Ind. 55, 138 N.E.2d 641 clearly defines our duty in regard to questions concerning the sufficiency of evidence. While this court will not weigh the evidence, it must be determined if there was substantial evidence of probative value from which the jury could have inferred the guilt of the appellant. By substantial evidence, I mean more than 'seeming or imaginary.' The rule is that *a verdict on which reasonable men might differ will not be set aside. However, if no reasonable man could find that the evidence has proved an accused guilty beyond a reasonable doubt, then the verdict is not sustained by sufficient evidence.* Additionally, it should be stated that to prove a fact or allegation beyond a reasonable doubt requires more than proof by a preponderance of the evidence. See also Epps v. State (1963), 244 Ind. 515, 526, 192 N.E.2d 459; Anderson v. State (1959), 239 Ind. 372, 378, 156 N.E.2d 384."

The evidence disclosed that the defendant resided with his wife, Rosemary, and two children—a son, Michael, Jr., three years old, and a daughter, Hazel, two months old, who was the victim.

In mid-January, 1973, the defendant took the baby by her arm and shook her. She continued to cry. He put her on the couch and placed one of his knees on the couch and the other on the baby's stomach and chest. Her voice was muffled and she stopped crying for awhile but started again. He held the baby's blanket over her head and held her by one arm and beat her in the back with his fist. Later in the day, Defendant threw a bottle at the baby and then poured water over her face and stuffed a belt into her mouth—all in an effort to make her stop crying. The person who witnessed and testified to this called the police, but when the matter was investigated, both that person and the defendant's wife lied about the incident, and no arrest was made. The baby was examined medically and x-rayed following this incident, but no serious injury was revealed.

On January 28, 1973, the family was at the home of Rosemary's aunt. When they returned to their home, the baby was crying. The defendant grabbed her and choked her. He took her by the leg and slapped her against something— it was not disclosed what. Shortly thereafter, the defendant and Rosemary became suspicious that the baby had a broken arm. The suspicion was confirmed a little later at the hospital.

On January 30, 1973, at about 9:00 p.m., the family again returned from a visit to the aunt's house, and the baby was crying. This time the defendant grabbed the baby and choked her. He held her around the waist and slammed her against the wall two or three times. The baby stopped crying and was put to bed. When Rosemary checked her at about 1:30 a.m., she appeared to be all right, but the next morning she was found dead on the couch, where she had been sleeping.

An autopsy was performed on the baby on January 31st. The performing physician testified that she had died of "multiple injuries" and proceeded to testify: "There were lesions, traumatic lesions on the head and on the arm and on the chest, lesions that altogether would explain the demise of this person. * * * There was blood in the subtissues in the back of the head and a fracture of the bones on the dome of the skull. * * * There were lesions in the brain as secondary to the fracture of the skull. There were a fracture of the right arm, and there were fractures to the ribs. * * * The fractures in the arm and the skull will be from twenty-four hours to four days old. The fractures on the ribs, they will be around two weeks old." Referring to the arm fracture, the witness testified, "It is a complete fracture of the bone with a separation of two segments of the bone." It could have been caused by "* * * applying a force when there are two points of support to the bone so in such a way that it bends beyond the elasticity that it is allowed and breaks." Referring to the skull fracture, the witness continued, "They were produced by a blunt force

applied against the head. * * * It would have to be a strong force against the flexible bones of a child."

It is counsel's contention that the State failed in its burden to prove that the injuries inflicted by the defendant caused the baby's death because the physician who performed the autopsy did not testify with greater specificity as to how the injuries produced the death and because he testified that certain of the injuries were from twenty-four hours to four days old, whereas other evidence was that the occasion of abuse by the defendant likely to have produced such injuries occurred less than twenty-four hours prior to the autopsy. However, with reference to the time interval the physician testified that he was giving an estimate only and that he could not say precisely when the injuries occurred.

As for a finding that the defendant caused the death of the baby, we hold the evidence to be sufficient. If the physician's testimony that the infant died of multiple injuries was wanting in desired specificity, it was, nevertheless, probative and substantial. The criticism levied by counsel might logically reduce the weight of the physician's testimony, but it did not render it incompetent. For that matter, although it is customary and desirable to prove the cause of death by medical testimony, such is not an absolute requirement, and under the circumstances of this case, there was sufficient evidence upon the issue even without the physician's testimony.

Upon the issue of malice and purpose, counsel asserts that under the authority of *Hutchinson* v. *State, supra,* the evidence could only support a conviction of involuntary manslaughter. *Hutchinson,* although similar to the case at bar and remanded with instructions to modify the second degree murder conviction to involuntary manslaughter is, nevertheless, of questionable precedential value. It was but a three judge opinion and drew a strong dissent from Justice Hunter. In that case, a three year old child died of a lacerated liver.

The defendant admitted having whipped her with a belt shortly prior to her death, neighbors who lived in the adjoining apartment had heard her crying, and she bore marks that could have been caused by the use of a belt with a buckle on the end of the pendulum. The medical testimony was that the lacerated liver could have been caused by a blow from a blunt instrument, but the majority held that there was only speculation that the defendant administered such a blow. Justice Hunter pointed out that upon that evidence alone, there could also be only speculation that the defendant caused the death at all. However, he proceeded to other facts in evidence which, when coupled with the crying and the belt lashing, gave rise to a logical inference that the defendant did administer such a blow with intent and malice.

Factually, the case at bar is inapposite to *Hutchinson* v. *State, supra.* This court speculated that Hutchinson may have been excessive in his disciplining of the child, a three year old. That, at least was a rational possibility. It is ludicrous, however, to speculate that one would punish an infant of two months by such brutal and perverse violence as was inflicted by this defendant—if, indeed, at all.

This Court has held innumerable times that malice may be shown by evidence that the defendant deliberately used a deadly weapon in such a way as likely to produce death, and that in such a case, the purpose to kill may be inferred from the act of killing. *Taylor* v. *State* (1973), 260 Ind. 264, 295 N.E.2d 600; *Blackburn* v. *State* (1973), 260 Ind. 5, 291 N.E.2d 686; *Turner* v. *State* (1972), 258 Ind. 267, 280 N.E.2d 621; *Maxwell* v. *State* (1970), 254 Ind. 490, 260 N.E.2d 787; *Maxey* v. *State* (1969), 251 Ind. 645, 244 N.E.2d 650; *Brattain* v. *State* (1945), 223 Ind. 489, 61 N.E.2d 462; *Landreth* v. *State* (1930), 201 Ind. 691, 171 N.E. 192; *Welty* v. *State* (1912), 180 Ind. 411, 100 N.E. 73; *Rigsby* v. *State* (1910), 174 Ind. 284, 91 N.E. 925; *Coolman* v. *State* (1904), 163 Ind. 503, 72 N.E. 568.

This Court has also held instrumentalities that are harm-

less in their general usage may, nevertheless be regarded as lethal when utilized in a harmful manner, as in *Corbin* v. *State* (1968), 250 Ind. 147, 237 N.E.2d 376, where we affirmed a conviction of second degree murder on evidence that a father inflicted fatal injuries upon his twenty-one month old daughter by blows with his hand and again in *Stice* v. *State* (1950), 228 Ind. 144, 89 N.E.2d 915, where we affirmed a conviction of second degree murder on evidence that the appellant had killed the victim with his fist. In *Stice* we stated that although the general rule is that a blow with the fist does not ordinarily imply malice or intent to kill, from the circumstances in the case, the use of the fist was such that the fist was a deadly weapon. In *Corbin* we stated that malice as a legal inference could be deducted from a perpetration of any cruel act and that the law presumes that an individual intends the consequences of his act. In *Wahl* v. *State* (1951), 229 Ind. 521, at 530 we stated, "Malice may be inferred from any deliberate or cruel act by one person against another." Several cases are there cited in support of that proposition.

We find no reversible error. The judgment of the trial court is affirmed.

Givan, C.J. and Arterburn, DeBruler and Hunter, JJ., concur.

NOTE.—Reported at 322 N.E.2d 705.