Michael ANDREWS,
Petitioner-Appellant,

v.

STATE of Indiana,
Respondent-Appellee.

No. 1–1185A295.

Court of Appeals of Indiana,
First District.

March 31, 1987.

Susan K. Carpenter, State Public Defender, C.H. Gardner, Deputy Public Defender, Indianapolis, for petitioner-appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Jay Rodia, Deputy Attys. Gen., Office of Attorney General, Indianapolis, for respondent-appellee.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Michael Andrews appeals his conviction for recklessly remaining in a voting booth longer than one minute, a class A misdemeanor. We affirm.

## FACTS

At the 1984 general election, Michael Andrews and three co-defendants staged a form of protest against the absence of write-in ballots in Indiana. Several minutes after entering the voting booth of Precinct 7 in Bloomington, Andrews was asked if he needed assistance and he demanded a write-in ballot. Andrews was informed that write-in ballots were not available and that he would either have to leave the voting booth or be arrested. An-

drews chose to remain in the voting booth for forty-five minutes until his arrest. Approximately one hundred and fifty voters were kept waiting in line during this episode. An hour later the booth was reset and made available to waiting voters.

On November 7, 1984, Andrews was charged with recklessly remaining in a voting booth for longer than one minute in violation of Indiana Code section 3–1–23–28. Following a jury trial, Andrews was found guilty. Andrews was sentenced to one year for the misdemeanor, with all but ninety days suspended, and sentenced to over one hundred days for being in contempt of court. Applying credit time, the Department of Corrections released Andrews at the expiration of his sentence. Following a hearing, the trial court recommitted Andrews after finding that credit time did not apply to contempt sentences. Thereafter, Andrews perfected this appeal.

## ISSUES

Andrews presents twelve issues for review which we have reworded and subsumed into the following:

1. Whether the evidence is sufficient to sustain Andrews' conviction for remaining in a voting booth for over one minute.

2. Whether the one minute rule was used in a discriminatory manner so as to deny Andrews due process and equal protection of the law, and whether the provision is unconstitutionally vague and overbroad.

3. Whether the trial court erred in refusing to dismiss the charge against Andrews for lack of subject matter jurisdiction.

4. Whether the trial court erred in refusing to admit certain evidence and in taking other actions all resulting in allegedly denying Andrews a fair trial.

5. Whether the trial court erred in denying Andrews' motion for impartial jury selection which allegedly resulted in systematically excluding from the jury inde-

pendent, third party, and low income voters.

6. Whether the trial court erred in denying Andrews' motions for a mistrial and disqualification where the trial judge consulted with outside sources during the trial.

7. Whether the trial court erred in finding Andrews in contempt of court or whether the trial court erred in failing to state specifically the acts complained of in its memoranda of contempt.

8. Whether the trial court committed reversible error in failing to rule on Andrews' motions to reconsider its contempt citations.

9. Whether the trial court erred in denying his motion to dismiss the November 19, 1985, hearing wherein the trial court determined good-time credits to be inapplicable to contempt sentences.

## DISCUSSION AND DECISION

### Issue One

It should be noted that when reviewing the sufficiency of the evidence, this court does not judge the credibility of witnesses nor weigh the evidence. Rather, we consider the evidence most favorable to the verdict together with all inferences which may be drawn therefrom. If there is substantial evidence of probative value to support each element of the offense, the judgment will be affirmed. *Johnson v. State* (1982), Ind.App., 441 N.E.2d 1015, 1016; *Anderson v. State* (1980), Ind.App., 406 N.E.2d 351, 352, *trans. denied; Stocklin v. State* (1976), 169 Ind.App. 49, 50, 345 N.E.2d 863, 864, *trans. denied.*

Andrews was convicted of recklessly remaining in a voting booth longer than one minute. Indiana Code section 3–1–23–28 [1] provides:

"At any primary election where voting is either by machine or printed ballot or both no voter shall remain within the voting booth or compartment longer than three (3) minutes; where, at any general

1. Repealed by P.L. 5–1986, § 61 effective March 4, 1986, and replaced by §§ 3–11–8–32 and 3–    11–8–33.

or special election, voting is by machine, no voter shall remain within the voting booth or compartment longer than one (1) minute; and where voting is by printed ballot, no voter shall remain within the voting booth or compartment longer than three (3) minutes. If any voter shall refuse to leave such booth or compartment after the elapse of such time, he shall at once be removed therefrom by the election board, or by the election sheriff or sheriffs upon order of the board."

A violation of this provision is made a class A misdemeanor by Indiana Code section 3–1–32–63 [2] which states "A person who recklessly violates a provision of this article for which a specific penalty is not otherwise provided commits a class A misdemeanor." Andrews freely admits that he violated the one minute provision. His contention, however, is that he did not violate Ind. Code § 3–1–23–28 recklessly as defined by statute. Indiana Code section 35–41–2–2(c) states, "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial devia-

tion from acceptable standards of conduct." The gist of Andrews' argument is that he has a constitutional right to cast a write-in ballot and, therefore, his insistence upon this right during the 1984 election cannot be a substantial deviation from acceptable standards of conduct. Andrews misunderstands the issue involved in this appeal.

It is Andrews' conduct, not his motivation, that is at issue in this case. Andrews' argument that he has a constitutional right to a write-in ballot may or may not have merit.[3] However, that issue is not before us at present and therein lies Andrews' confusion. Andrews was charged and convicted of remaining in a voting booth for longer than the law permits; he was not charged with attempting to cast a write-in ballot. The issue before this court and the trial court is not the constitutionality of write-in ballots, but rather the legality of Andrews' remaining in the voting booth over the allotted time period.

Andrews recklessly remained in the voting booth longer than statutorily permitted. Andrews and his co-defendants entered the Bloomington poll well aware of the fact that many other people were waiting to exercise their right to vote. Andrews en-

**2.** Repealed by P.L. 5–1986, § 61, effective March 4, 1986, and replaced by Indiana Code §§ 3–14–1 *et seq.* through 3–14–5.

**3.** Apparently, Indiana law does not permit the casting of "write-in" votes. According to an official opinion of the Attorney General, the Indiana Election Code specifies several fair and liberal means by which a candidate's name may appear on a ballot to stand for election to public office either as a party or independent candidate. 1975 Op.Att'y Gen. No. 1. Repealing prior acts, the 1969 Indiana General Assembly made clear its intention that only those candidates whose names appear on the ballot may be voted for legally. Therefore, Indiana law does not permit the casting of "write-in" votes.

Andrews bases his argument that he has a constitutional right to a write-in ballot on the United States District Court decision *Socialist Labor Party v. Rhodes* (S.D.Ohio 1968), 290 F.Supp. 983, *cert. granted Williams v. Rhodes* and *Socialist Labor Party v. Rhodes* (1968), 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, and the Supreme Court's opinion on appeal. Specifically, the district court stated:

"Voters are often not content to vote for one of the candidates nominated by the two major parties. A write-in ballot permits a voter to

effectively exercise his individual constitutionally protected franchise. The use of write-in ballots does not and should not be dependent on the candidate's chance of success. The denial of this unfettered freedom of choice is a denial of the equal protection of the laws as guaranteed by the Fourteenth Amendment."

*Socialist Labor Party*, at 987. Thus, the court granted the Socialist Labor Party relief to the extent of permitting write-in ballots despite Ohio law. On appeal, the United States Supreme Court affirmed this remedy. *Williams*, at 34–35, 89 S.Ct. at 12–13, 21 L.Ed.2d at 33–34. In addition, Andrews argues that Indiana Code section 3–1–31–2(15) provides him with the right to cast a write-in ballot. I.C. § 3–1–31–2 states:

"Hereafter no make of voting machine shall be approved for use unless it is so constructed that: ...

"(15) It will permit a voter to vote, in any regular or special election, for any person desired to be voted for whose name does not appear upon the voting machine."

Regardless of this statute, since repealed, or the federal and Supreme Court decisions and their possible impact upon Indiana law, the question of the right to cast a write-in ballot is not an issue in this case.

tered a voting booth and remained there several minutes until an election official asked him if he needed assistance. Andrews then demanded a write-in vote and was informed none were available and that he would have to vacate the booth or be arrested. Andrews chose to remain in the voting booth approximately forty-five minutes until the police arrived to arrest him. Andrews apparently had no qualms about deterring the voting rights of one hundred and fifty other people, possibly disenfranchising them. It was an hour before the voting booth could be reset for use by other waiting voters. Clearly, Andrews' conduct was in plain, conscious, and unjustifiable disregard of the rights of the other waiting voters. Andrews is presumed to have intended the consequences of his acts. *Covington v. State* (1975), 262 Ind. 636, 643, 322 N.E.2d 705, 708; *Emery v. State* (1968), 250 Ind. 500, 504, 236 N.E.2d 28, 30. In addition, criminal intent to commit a specific criminal act may be presumed from the voluntary commission of the act. *Coffer v. State* (1958), 239 Ind. 22, 23, 154 N.E.2d 371, 371. Thus, Andrews is presumed to have intended to disrupt Precinct 7, leave the voting machine temporarily inoperative and, in the process, interfere with the voting rights of others. Andrews' actions were not in conformance with typically acceptable standards of conduct at an election po'l and he, therefore, clearly possessed the reckless intent necessary to sustain his conviction.

▆▆▆ Moreover, a lawful objective will not justify the employment of means which are themselves unlawful. *Roth v. Local Union 1460 of Retail Clerks Union* (1939), 216 Ind. 363, 24 N.E.2d 280 (lawful objective does not justify disorderly or unlawful picketing). Neither does evidence of good motive for commission of a crime constitute a defense even when specific intent is required. 22 C.J.S. *Criminal Law* § 31 (1961); 1 Wharton's Criminal Evidence § 166 (12th ed. 1955). Various individual constitutional rights exist as a unitary portion of a group of corollary rights, each of which can be exercised only to the extent that such does not encroach upon or erode the others. *Cunningham v. State* (1973),

261 Ind. 256, 258, 301 N.E.2d 638, 640, *quoting Campbell v. State* (1971), 256 Ind. 630, 633, 271 N.E.2d 463, 465.

"The States, within the limitations imposed by the due process and equal protection requirements of the Fourteenth Amendment to the Constitution of the United States, may regulate and restrain the exercise of the freedom of expression, thereby insuring to all the freedom from the abusive exercise of the rights of others."

*Campbell,* at 633, 271 N.E.2d at 465. Thus, despite Andrews' motivation or good intentions he does not have the right to exercise his rights at the expense of other peoples' rights. W. Stanmeyer, *The New Left and the Old Law,* 55 A.B.A.J. 319 (1969). Andrews could have chosen a legal method of protesting or challenging Indiana's lack of write-in ballots. However, he chose instead to break the law and impede the voting rights of fellow voters. Regardless, as we noted above Andrews' motivation is irrelevant under the circumstances and the evidence was sufficient to support his conviction for recklessly remaining in a voting booth longer than the law allows.

*Issue Two*

Based on his argument in Issue One, Andrews claims the one minute rule is unconstitutional because it denied him equal protection and is overbroad and vague. Andrews' argument is based on his assumption that the one minute rule was used to deny him the right to cast a write-in ballot. In other words, Andrews claims that the one minute rule was used as a tool to deny him his right to vote. Once again, Andrews misunderstands the actual issue involved regarding the one minute rule.

▆▆▆ The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia* (1920), 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990–91; *Plyler v. Doe* (1982), 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786, 798. Under traditional equal protection principles, distinctions need only be

drawn in such a manner as to bear some rational relationship to a legitimate state end. *Clements v. Flashing* (1982), 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508, 515. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them. *Clements*, at 963, 102 S.Ct. at 2843, 73 L.Ed.2d at 515; *see, e.g., McDonald v. Board of Election Comm'rs* (1969), 394 U.S. 802, 808–809, 89 S.Ct. 1404, 1408–1409, 22 L.Ed.2d 739, 745; *McGowan v. Maryland* (1961), 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393, 399. The Supreme Court has departed from traditional equal protection principles only when the challenged statute places burdens upon "suspect classes" of persons or on a constitutional right that is deemed to be "fundamental". *San Antonio Independent School Dist. v. Rodriguez* (1973), 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33. With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.[4] *Plyler*, 457 U.S. at 217, 102 S.Ct. at 2395, 72 L.Ed.2d at 799.

■ Enforcement of the one minute rule, in this case, did not result in a violation of Andrews' Equal Protection rights. The one minute rule of Ind.Code § 3–1–23–28 serves a compelling state interest in moving the flow of voters into the polls in a quick and orderly fashion thereby enabling all of them to exercise their voting rights. Andrews again confuses the issue involved in his case. There is no evidence in the record to demonstrate that the one minute rule was used as a means solely to deny Andrews, or anyone else, the right to a write-in ballot. Neither is there any evidence to demonstrate that the rule was applied unequally or strictly to Andrews. On the contrary, voters who appeared to be having trouble casting their vote were approached by election judges who asked if they needed assistance. Unlike other voters, Andrews, after being repeatedly told that the name of the person he was searching for on the ballot was not a candidate, and that no write-in ballots were available, insisted on remaining in the machine until his arrest. Andrews was not treated differently or unequally. He was simply the only person to abuse the rule. There is no evidence the one minute rule was used only to arrest people asking for write-in ballots. The one minute rule did not serve to create a classification in violation of the Equal Protection Clause but merely served as a means by which the state could ensure that each voter had their opportunity to cast a vote.

■ Andrews' argument that I.C. § 3–1–23–28 is vague and overbroad must also fail. Andrews asserts that the one minute rule allows election officials not only "to pick and choose which voters having trouble would be arrested, but also allowed them to cull out for arrest those who like Andrews sought to vote a particular way[.]" In order to satisfy due process requirements, a statute must be so explicit as to inform individuals of ordinary intelligence of the consequences of their conduct. It must not cause men of common intelligence to guess at its meaning or differ as to its application. *Graham v. State* (1985), Ind.App., 480 N.E.2d 981, 987, *trans. denied; Miller v. State* (1983), Ind.App., 449 N.E.2d 1119, 1128. Overbreadth involves a challenge to a statute based not upon the defendant's conduct, but rather upon legitimate conduct which might foreseeably be prohibited by a statute which is not drawn

---

**4.** Courts look to the Constitution to see if a right infringed has its source, explicitly or implicitly, therein, in determining whether a class based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause. The right to vote, *per se,* is not a constitutionally protected right. *San Antonio Independent School Dist.,* 411 U.S. at 35, 93 S.Ct. at 1298, 36 L.Ed.2d at 44 n. 78. However, with regard to suffrage the Supreme Court has explained the need for strict scrutiny as arising from the significance of the franchise as the guardian of all other rights. *See Harper v. Virginia Bd. of Elections* (1966), 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169, 173; *Reynolds v. Sims* (1964), 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527.

in sufficiently narrow terms. *Porter v. State* (1982), Ind.App., 440 N.E.2d 690, 693. The statute is not vague as it states explicitly that where voting is by machine "no voter shall remain within the voting booth or compartment longer than one [1] minute[,]" thereby clearly delineating the conduct expected of a voter. Andrews fails to present any evidence demonstrating how the statute was overbroad. It is ludicrous to assert that the effect of the rule was to deny Andrews a write-in ballot; write-in ballots are not available in Indiana. The purpose and effect of the rule is obviously to move voters through the polls at a reasonable rate so as to give everyone the opportunity to cast their ballot. There is no merit to Andrews' claim that the one minute rule is vague or overbroad or was enforced in such a way as to deny him equal protection of the law.

*Issue Three*

Andrews argues that the trial court erred in failing to dismiss the charge against him for lack of subject matter jurisdiction. Specifically, Andrews argues that the statute under which he was charged, I.C. § 3–1–23–28, fails to state a crime and that the Constitution of Indiana, Article 2, § 12, grants electors freedom from arrest while at the polls exercising the right to vote. The trial court denied Andrews' motion for a directed verdict on these grounds following the close of the State's presentation of evidence.

█ First, it should be noted that Andrews has waived any alleged error regarding his motion for a directed verdict. A trial court's ruling on a motion for a directed verdict is not subject to review on appeal where the movant has introduced evidence on his behalf after the motion was denied. *Dziepak v. State* (1985), Ind., 483 N.E.2d 449, 452; *Buck v. State* (1983), Ind., 453 N.E.2d 993, 995; *see Marsillett v. State* (1986), Ind., 495 N.E.2d 699, 702 n. 2. Since Andrews proceeded to present evidence after his motion was denied, he cannot now claim the trial court erred.

█ Andrews is correct in noting that the one minute rule, I.C. § 3–1–23–28, does not state a crime. However, it proscribes conduct, the violation of which is made a class A misdemeanor by Indiana Code section 3–1–32–63.[5] Thus, the trial court did not err in failing to dismiss the charge against him since it was based properly on a statute the violation of which is criminal.

█ Neither does Andrews' constitutional argument bear any merit. The Constitution of Indiana, Article 2, § 12 states, "In all cases, except treason, felony, and breach of the peace, electors shall be free from arrest, in going to elections, during their attendance there, and in returning from the same." Apparently, Andrews views his actions, resulting in his conviction of a misdemeanor, as something other than a breach of peace. On the contrary, Andrews' actions disrupted and delayed the voting process at the 7th precinct. His conduct impeded the voting of approximately one hundred and fifty people, essentially violating their constitutional right to vote. These actions constitute a breach of the peace and so Andrews does not come under the protection of Article 2, § 12 of the Indiana constitution.

*Issue Four*

Andrews argues that, through numerous actions and decisions of the trial court, he was denied a full and adequate opportunity to present a defense on his own behalf. Though not particularly clear, Andrews' overall complaint appears to be that relevant evidence was excluded as a result of these errors.

Rulings of a trial court on the relevancy of evidence are accorded wide latitude. The rejection or admission of evidence is in the sound discretion of the trial court. *Fischer v. State* (1984), Ind., 468 N.E.2d 1365, 1368; *Hossman v. State* (1985), Ind. App., 482 N.E.2d 1150, 1156, *trans. denied.* We will reverse only when it is shown that the trial court manifestly abused its discretion and the complaining party was denied

---

5. "General penal clause.—A person who recklessly violates a provision of this article for which a specific penalty is not otherwise provided commits a class A misdemeanor."

a fair trial. *Henderson v. State* (1983), Ind., 455 N.E.2d 1117, 1119; *Hossman,* at 1156.

As Andrews' argument in his brief demonstrates, the evidence he attempted to admit dealt with the underlying motive of his offense; the evidence concerned his defense that he was denied his constitutional right to a write-in ballot, and that, therefore, the State was guilty of violating the statute with which he was charged. Andrews admitted he committed the act but insisted that his motivation rendered his conduct legal since he intended only to assert what he viewed as a constitutional right. Motive is not an essential element of a crime. *Griffin v. State* (1980), Ind.App., 413 N.E.2d 293, 295. Although evidence of motive has been found admissible and probative, *Biggerstaff v. State* (1982), Ind., 432 N.E.2d 34, 36, its admission is still committed to the discretion of the court. *Drummond v. State* (1984), Ind., 467 N.E.2d 742, 747. Moreover, evidence, otherwise admissible, may be excluded if its probative value is substantially outweighed by its potential to prejudice or confuse the jury. *Mers v. State* (1986), Ind., 496 N.E.2d 75, 80. Again, Andrews' assertion of an alleged constitutional right to a write-in ballot is not at issue here. The only question presented was what Andrews' intention or *mens rea* was when he chose to remain in the booth. Here, Andrews intended to cause some form of disruption. Andrews' culpability for conscious reckless activity is not excused simply because he believes such action will further what he believes to be a constitutional right. At trial, Andrews merely attempted to litigate his alleged constitutional right to cast a write-in ballot. We would point out that evidence regarding Andrews', or others', knowledge of the election code does not negate intent. Andrews' constant references to write-in ballots as his purpose and their tangential connection to the real issue at bar could easily have confused the jury. We agree with the state that it was within the judge's discretion, if not his duty, to prevent such an easy confusion and keep the trial directed to the proper issues. The trial court did not abuse its discretion in refusing to admit certain evidence and testimony.

Andrews also argues the trial court erred in refusing to grant his request for the advise and assistance of counsel in order to help him prepare his *pro se* defense. Andrews and his co-defendants did not want to be represented by counsel but merely to have one appointed to advise them:

"MR. ANDREWS: We're not requesting standby counsel.

"THE COURT: Okay, say again what you want?

"MR. ANDREWS: Standby counsel is where we allow, that is a highbred [sic] form of representation, where we can exist our own representation at any moment of use counsel, and then say, counsel sit back and we will take the floor again, and we're not requesting that, we have no wish at any point in proceeding to be represented, that is spoken for."

Record at 400.

"THE COURT: Okay, why do you choose not to be represented?

"MR. ANDREWS: The reason I feel have requested some of our written motions, I personally feel very strongly that it would be impossible or very unlikely that a member of the bar could make the types of political or constitutional arguments that I would make.

"THE COURT: Because of professional limitations you mean?

"MR. ANDREWS: Yes.

"THE COURT: Or because of ability?

"MR. ANDREWS: No, both, because of by training and ability first of all, because there's no experience in any member of the bar that I have familarity with, and I know a great number of them, with the conduct of these types of what I would call, civil liberties and political cases. I believe I have much more experience and have thought about it much more and I believe that I would be disadvantaged to try to develop that

knowledge on the part of an attorney, and speak through an attorney."

Record at 400–401.

"THE COURT: Okay, let me start, start fresh then. I'm going to determine right now your use of the Public Defender's Office, and whatever has been, whatever record has been done before is, right this minute, irrelevant. So now, do you want a Public Defender to represent you?

"MR. ANDREWS: To represent us? No.

"MR. SZURGOT: No.

"MR. MOORE: No. We want the advice and assistance of the Public Defender and we wish to proceed pro se.

Record at 403.

"THE COURT: ... I will appoint the Public Defender to represent you, if you desire that, if you demand your right to proceed pro se, unless there's some other reason for a specific thing down the road, you'll be pro se, you have a right to that, and I'll grant you that."

Record at 404–405. As the record demonstrates, Andrews was offered representation by counsel and turned it down. He cannot now be heard to complain of lack of assistance when he was repeatedly offered counsel by the trial court. Moreover, the public defender offered to assist Andrews on his own time. There is no error here.

Andrews attempts to raise a couple of other alleged errors under this issue apparently concerning the time he was given to prepare instructions and statements made by the trial judge during the trial. These assertions are made in passing without development of any type of argument or citation to any authority. Bald assertions of error unsupported by either cogent argument or citation to authority result in waiver of any error on review. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7); *Whitaker v. St. Joseph's Hospital* (1981), Ind.App., 415 N.E.2d 737, 746; *Dominguez v. Gallmeyer* (1980), Ind.App., 402 N.E.2d 1295, 1298, *trans. denied.* Therefore, any error Andrews attempts to assert on these grounds is waived.

*Issue Five*

Andrews argues the trial court erred in denying his motion for impartial jury selection which resulted in systematically excluding from the jury a particular class of persons. Specifically, Andrews asserted that over 30,000 adult Monroe County residents were not registered voters and that voter registration lists underrepresented independent, third party, and low income voters. Therefore, Andrews urged the court to use the Post Office address list to call the jury venire, which motion the trial court denied.

Absent a showing of a deliberate attempt to exclude certain groups from jury participation, our supreme court has held that the practice of selecting jurors from registered voters is permissible. *Lamar v. State* (1977), 266 Ind. 689, 696, 366 N.E.2d 652, 656; *Baum v. State* (1976), 264 Ind. 421, 424, 345 N.E.2d 831, 833; *see also Moore v. State* (1981), Ind.App., 427 N.E.2d 1135, 1138, *trans. denied.* In order to establish a prima facie violation of the fair cross-section requirement, a defendant must show:

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587. The problem depends upon what may be said to constitute a "distinctive" group. Adopting California's definition, we have stated:

"... [B]efore exclusion may be held improper, there must be a common thread running through the excluded group—a basic similarity of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community."

*Moore*, at 1138, *quoting Adams v. Superior Ct. of San Diego Co.* (1974), 12 Cal.3d

55, 60, 115 Cal.Rptr. 247, 250, 524 P.2d 375, 379. Apparently Andrews feels that the "group" of unregistered voters is composed of a disproportionate number of third and independent party members.[6] Andrews offers no proof, statistical or otherwise, to substantiate this assertion. Andrews fails to prove the existence of any common thread running through this excluded group. More importantly, Andrews fails to demonstrate any deliberate attempt on the part of the trial court or state to exclude any particular type of group from jury participation. The trial court did not err in denying Andrews' motion and in selecting the jury from a venire composed of registered voters.

*Issue Six*

Andrews argues the trial court erred in denying his motions for a mistrial and for the trial judge to disqualify himself based on consultations the trial judge had with outside sources during the trial. After lengthy arguments on the admissibility of evidence concerning write-in votes, and Andrews' belief that such a right existed in Indiana, the trial court ruled the evidence was inadmissible. In response to Andrews' inquiry, the trial judge stated that he had discussed the admissibility of the offered evidence with other judges and agencies but that the decision was solely his own. Record at 1784. Andrews then inquired as to the identity of each party the trial judge had consulted and the content of the consultation. Andrews then moved for the judge to recuse himself and declare a mistrial.

Andrews argues that the trial judge's consultation violated Canon 3(A)(4) of the Code of Judicial Conduct. Canon 3(A)(4) provides:

"The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. Adjudicative responsibilities.

. . . .

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond."

Canon 3(C)(1)(a) provides:

"(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]"

Accordingly, this court has held that a judge's personal knowledge acquired through extrajudicial sources requires recusal. *Stivers v. Knox County Dept. of Public Welfare* (1985), Ind.App., 482 N.E.2d 748, 751; *Jones v. State* (1981), Ind.App., 416 N.E.2d 880, 881.

However, the law also presumes that a judge is unbiased and unprejudiced in the matters before him. *Jones,* at 881; *Leistikow v. Hoosier State Bank of Indiana* (1979), 182 Ind.App. 150, 152, 394 N.E.2d 225, 227. The only type of prejudice which will disqualify a judge is a personal prejudice for or against a party. *Jones,* at 881; *Leistikow,* 394 N.E.2d at 227. The record must show actual bias and prejudice of the judge against the defendant before a conviction will be reversed on the ground that the trial judge should have disqualified himself. *Rose v. State* (1986), Ind.App., 488 N.E.2d 1141, 1144.

---

**6.** We note that Andrews is a registered voter and therefore does not belong to this theoretical group.

■ Andrews has failed to demonstrate any actual bias or prejudice on the part of the trial judge. Andrews grounds his assertion on the fact that the trial judge ruled negatively regarding his various attempts to introduce evidence concerning write-in votes. Mere assertions that negative rulings stem from the prejudice or bias of the judge do not constitute examples of the requisite bias that must be evident in the record. Furthermore, as we have stated repeatedly, the constitutionality of Indiana's prohibition against write-in votes was not and is not an issue in this case. Therefore, any failure to comply with Canon 3(A)(4), if in fact there was one, resulted in harmless error. The trial judge did not err in denying Andrews' motions for disqualification and a mistrial.

*Issue Seven*

■ Andrews raises four issues concerning contempt convictions he incurred during the course of the trial. Essentially Andrews argues none of these incidents disturbed the proceedings enough to amount to contempt. In the alternative, Andrews argues that the trial court, in its memorandum of contempt, failed to set out the contemptuous act with the specificity required by statute. It is this latter argument we address in three of the instances and so we have re-grouped Andrews' issues accordingly.

Indiana Code section 34–4–7–7 provides, in pertinent part:

"[T]he court shall distinctly state the act, words, signs or gestures, or other conduct of the defendant which is alleged to constitute such contempt; and such statement shall be reduced to writing either by the judge making it, or by some reporter authorized by him to take it down when made; and the same shall be substantially set forth in the order of the court on the same[.]"

It has been held that the mere recital of the trial court's conclusions is not sufficient to satisfy the requirement that the acts constituting the alleged direct contempt shall be stated distinctly in the court's order. *State ex rel. Stanton v. Murray* (1952),

231 Ind. 223, 236, 108 N.E.2d 251, 257. Instead, the court's finding must recite in detail the acts found to have been committed and which constitute the contempt for which the defendant is punished. *State ex rel. Allen v. Vermillion Circuit Court* (1967), 248 Ind. 258, 262, 226 N.E.2d 324, 326.

■ At a preliminary hearing, on July 19, 1985, the following exchange took place between Andrews and the trial court which resulted in his first contempt conviction.

"MR. ANDREWS: ... (After moving for the trial Judge to disqualify himself.) I also have a question, is Your Honor a member or did you stand for candidacy to the bench as a member of the Republican or Democrat party?

"THE COURT: Okay, I'll show your motion denied, is there anything else that needs to be addressed?

"MR. ANDREWS: I'd asked you the question whether you are a Republican or Democrat?

"THE COURT: Okay, I don't have to answer your questions.

"MR. ANDREWS: Do you refuse to do that?

"THE COURT: Is there anything else that needs to be addressed today?

"MR. ANDREWS: Let the record show . . .

"THE COURT: Mr. Andrews if you're going to ask that question again, I'm going to hold you in contempt of Court.

"MR. ANDREWS: No I'm not, I'm just letting the record, I would like to place on the record to note that the Judge did refuse to answer the question. Thank you.

"THE COURT: Okay, Mr. Andrews I consider that contemptuous and I'm going to fine you $50.00 dollars.

"MR. ANDREWS: Huh.

"THE COURT: Okay, I'm going to let you sit it out at the county jail, at the rate of $50.00 dollars a day, that means you've got 24 hours to sit in the county jail. Will you please call the Sheriff...."

Record at 548–49. Later Andrews was permitted to explain why he should not be held in contempt. However, the court did not change its decision and entered the following:

## "MEMORANDUM OF CONTEMPT FINDING

On this date, Special Judge Raymond L. Kern found the Defendant, Mike Andrews, in Contempt of Court for continuing to issue questions and make statements of a particular nature after having been told to cease; and, that continuation of such would be considered contemptuous. Mr. Andrews was given a fifty dollar fine or one day of jail."

Record at 24, 117.

Following Andrews' explanation, another exchange occurred which resulted in a second contempt conviction:

"THE COURT: Okay, is there anything else that needs to be addressed? Before we adjourn today? All right, Mr. Andrews don't leave the Courtroom.

"CO–DEFENDANT: May I ask, May I ask, this prohibition against me stating that I have, that I am receiving an unfair trial, is that a prohibition against me in general, in public or just stating to you personally that I believe I'm receiving . . .

"THE COURT: That's prohibition against all four of you stating that here in the Courtroom.

"CO–DEFENDANT: To never state this in the Courtroom?

"MR. ANDREWS: By what authority?

"CO–DEFENDANT: May I ask by what authority? By whose authority or what authority or my constitutional right for expression being denied?

"MR. ANDREWS: We've been asked to cite relevance, cite case law, to cite you law, Your Honor are you acting ministerial or arbitrary fashion, is there some citation that we might be guided by in our future conduct?

"THE COURT: How could it be less clear what I'm saying? How could it be more clear, how have I muddied that up?

"MR. ANDREWS: What's clear to me is that this is a kangaroo proceeding, with Your Honor presiding as a Republican potentate of the bar in order to screw us as to our . . .

"THE COURT: Okay, that just cost you five more days, and this hearing is now adjourned."

Record at 551–52. The court then entered the following Memorandum of Contempt:

"Mr. Andrews continued like statements including labeling the proceedings as a 'Kangaroo Court'. The Court found Mr. Andrews to be in contempt a second time and ordered him held for five days, and not to leave the courtroom."

Record at 117.

On August 2, 1985, the third day of trial, Andrews was again found in direct contempt due to the following exchange which occurred after a ruling by the trial court concerning whether Monroe County used electronic voting machines:

"THE COURT: Okay, I've, now, thoroughly understand your argument. I've been asked to make a determination. I (inaudible) . . .

"MR. ANDREWS: Well, I didn't ask you. I simply said that you had not made such a finding. I would think it would be appropriate for you to explore the matter a little bit before making a ruling of that type off of the top of your head.

"THE COURT: Okay. I don't have to do that. I'm familiar enough with that system (inaudible) . . .

"MR. ANDREWS: I understand you don't have to do things in a measured and considerate way.

"THE COURT: Mr. Andrews, I . . .

"MR. ANDREWS: It's a complex question.

"THE COURT: . . . consider that to be a contemptuous remark.

"MR. ANDREWS: I didn't . . .

"THE COURT: . . . And, I will deal with that after this hearing. Please refrain from anymore contemptuous remarks in that (inaudible).

"MR. ANDREWS: Well, if, have you found me in contempt?

"THE COURT: Go ahead Mr. Haggerty. At this time, I am going to deal with that after this hearing Sir.

"MR. ANDREWS: So, you have not yet found me in contempt? I need to know that so I can prepare.

"THE COURT: I'm telling you to please refrain from any further contemptuous remarks until this hearing is over. Mr. Haggerty, go ahead with your question."

Record at 1688–90. After the jury was dismissed the following exchange took place:

"THE COURT: I'm asking you why I should not consider your remarks that were made earlier, the one sentence that I quoted, to be contemptuous. You're arguing about punch card systems now. And, I don't understand the relevance of your argument. If you want to clarify that in my mind. That's what you need to do right now.

"MR. ANDREWS: Okay. Well, let me say, that it is my understanding that that the legal procedure when you propose to hold me in contempt is not to show why you shouldn't hold me in contempt but to that I should not be held in contempt. I believe that I have a right to be presumed innocent of contempt and not to be presumed guilty and then have to show Your Honor that I'm not guilty when you've already presumed to be guilty of that. You suspect that the remark was contemptuous and want to find our you can examine me. I'm attempting, without examination, to tell you why I should not be held in contempt. I believe it was not disruptive to the Court with a comment that only took a few seconds. I've told you that I intended no reflection on the Court's honor or integrity. I don't know how, I'm not, I don't understand why you would hold me in contempt for that remark. If you, if you let me know why you would consider holding me in contempt, perhaps I can address that and tell you why I should not be held in contempt.

"THE COURT: Okay. I will accept that explanation. And, I will go ahead and address that issue.

"MR. ANDREWS: Thank you.

"THE COURT: I consider that to be a contemptuous remark because you have, in the past, specifically said that you do not recognize my authority. I don't remember whether you have said ability; but, I got the implication from other things that have been said, ability also, to conduct this Trial. That seemed to me a further expression of those sentiments and made to play to the audience, that is behind you, that seemed to enjoy that remark. And, I considered it disruptive when I heard it. Therefore, I considered it contemptuous. I accept your explanation and I won't make a finding of contempt at this time. But, I warn you that that type of remark in the future will be held contemptuous and will be punished as contempt.

"MR. ANDREWS: I would like to ask Your Honor, I don't back away from my previously expressed opinions as to the ability. And, by that, I don't mean to offend your personal ability, I meant the institutional ability. The Court to conduct the Trial nor the authority of the Court to conduct a Trial. And, I hope that my political opinions with respect to that, which I believe I'm entitled to, won't prejudice Your Honor with respect to you adding context to any remarks that I might make that might be accepted from another person whose political opinions you weren't antagonized by. Thank you.

"MR. HAGGERTY: Judge.

"THE COURT: Having said what you've just said, I no longer believe that you didn't mean to impune [sic] the dignity of this Court by that remark that you made. Specifically, the remark that you understand that I do not have to deal with things in a measured and considered manner. And, I find that to be contemptuous and I order you to serve five days in the Mor, Morgan Co, er, Monroe County Jail for that ..."

Record at 1710–13. The trial court issued the following memorandum of contempt:

"BE IT FURTHER REMEMBERED, that on the 2nd day of August, 1985, The Court now finds the Defendant, Michael

Andrews, in further contempt of this Court for statements made on record. The Court now sentences the Defendant to additional five days to be served in the custody of the Sheriff of Monroe County or another correctional facility. Raymond L. Kern, Special Judge."

Record at 217.

While there is little doubt that Andrews' obstreperous conduct was contemptuous, these convictions cannot stand. As noted, Ind.Code § 34–4–7–7 and case law require the trial court to issue an order explicitly detailing the contemptuous conduct. In the above three instances, the trial court's orders did not meet the specificity required and therefore these convictions must be reversed.

■■■ Finally, at the close of the July 19, 1985, hearing, Andrews left the courtroom despite the trial court's immediate prior order that he remain until the sheriff could take custody of him to serve the six days for the two previous contempt findings of that day. The court issued the following memorandum of contempt:

"Mr. Andrews at this time left the Courtroom and did not return nor did Mr. Andrews report to the Monroe County Jail should that have been his misunderstanding. The Court now finds the actions of leaving the courtroom to be in direct contempt of an order to do so otherwise and orders Mike Andrews to serve ninety days for said contempt. Warrant ordered issued for his arrest."

Record at 24, 118. This order sufficiently meets the requirements of specificity set out in Ind. Code § 34–4–7–7.

Andrews argues, however, that his conduct amounted to indirect contempt and that the trial court ignored the requirements of Indiana Code sections 34–4–7–8, 34–4–7–9, and 34–4–8–1 thereby denying him due process of law.[7] Andrews supports his contention that he was not in

direct contempt arguing that when he left the courtroom the proceedings were over and the judge had left the room. Andrews cites to several affidavits accompanying his motion to correct errors to support his contention that he left the courtroom subsequent to the judge's departure.

■■■ Direct contempt usually refers to conduct directly interfering with court proceedings while court is in session. Indiana Code sections 34–4–7–1; 34–4–7–2. Such conduct must generally take place in or immediately adjacent to the courtroom, while court is in session, so that the judge has personal knowledge of such conduct in his official capacity. *La Grange v. State* (1958), 238 Ind. 689, 694, 153 N.E.2d 593, 596; *see State ex rel. Stanton v. Murray* (1952), 231 Ind. 223, 108 N.E.2d 251. However, it has been held that, under the inherent power theory, the statutory definitions of contempt are not so all-inclusive as to exclude other acts or conduct which may constitute contempt. *La Grange*, 238 Ind. at 694, 153 N.E.2d at 596.

■■■ Indirect contempt is the willful disobedience of any lawfully entered court order of which the offender has notice. Indiana Code section 34–4–7–3. Indirect contempt arises from conduct not occurring in the presence of the court, such as failure of a party to obey a court order or process, whereas direct contempt is committed in the immediate view or presence of the court. *Hegedus v. Hegedus* (1978), 178 Ind. App. 620, 621, 383 N.E.2d 446, 447 n. 1.

■■■ At an August 8, 1986, hearing concerning Andrews' contempt convictions, the trial court indicated he was personally aware of Andrews' departure from the courtroom moments after the occurrence. Summarizing Andrews' previous contemptuous acts the court stated:

"All right. If you want to address that issue, we can address that issue as to what time has been ordered served. If

7. Ind.Code §§ 34–4–7–8 and 34–4–7–9 provide the basic framework for adjudication of indirect contempt charges. Section 34–4–7–8 provides for notice to the person being charged and permits him to show cause why he should not be charged. Section 9 sets out the procedure for the proceedings, decision, and appeal of the indirect contempt charge. Ind.Code § 34–4–8–1 provides for and sets out the procedure for selecting a special judge to preside over indirect contempt proceedings.

you want to clarify that matter. And, let me just tell you right off of the bat how I view it. I view a one day sentence for the first contempt finding plus a five day sentence for the second plus a ninety day sentence for the contempt of court having disobeyed a direct order leaving the Courtroom after having been told to remain in the Courtroom until the Sheriff arrived. And, then, when I arrived back in the Courtroom, he was gone."

Record at 2518–19. Direct contempt may result from an act committed within the personal knowledge of the judge. *La Grange,* 238 Ind. at 694, 153 N.E.2d at 596. The record indicates that Andrews left the courtroom after the trial judge had departed. However, as the judge's above account reveals, he returned to the courtroom to find that Andrews had left in violation of his order. The judge had immediate personal knowledge of Andrews' disobedience of his order which constituted a blatant disrespect for the court's authority. Therefore, Andrews' conduct was properly punishable as direct contempt of the court and the trial court did not err in failing to follow the procedure for adjudication of indirect contempt.

*Issue Eight*

■ On July 31, 1985, Andrews filed, pursuant to Ind.Code § 34–4–7–7, a motion to reconsider his three contempt citations received at the July 19th hearing. Following several procedures and delays, the trial court failed to rule on this motion. On September 5, 1985, Andrews filed a motion requesting a ruling on his motion to reconsider, which the trial court did not act on. Andrews argues the court's neglect denied him due process and resulted in reversible error.

Andrews was not harmed by the court's failure to rule on his motions. Indiana Rules of Procedure, Trial Rule 53.4(B), providing for the effect of a court's delay in ruling upon a repetitive motion or a motion to reconsider ruling on a motion, states that "[u]nless such a motion is ruled upon within five (5) days it shall be deemed denied, and entry of service of notice of such denial shall not be required." In addition, Ind.Code § 35–4–7–7 merely permits a defendant to file a motion to reconsider, and then if that is overruled, to proceed to appeal the denial. Andrews presents no authority that the court's omission requires reversal. Had the trial court specifically denied Andrews' motion, he would be in the same position he is in now. No prejudice resulted from the trial court's omission because the issue is before this court now on appeal. This is clearly demonstrated by our reversal of three of the contempt convictions. The trial court did not commit reversible error in failing to rule on Andrews' motions to reconsider.

*Issue Nine*

Finally, Andrews argues the trial court erred in denying his motion to dismiss the November 19, 1985 hearing which, he asserts, resulted in an increased sentence in violation of the Double Jeopardy Clause. The Department of Correction released Andrews after calculating good-time credit and applying the credit to his misdemeanor and contempt sentences. Apprised of Andrews' release, the trial judge ordered him into court to determine the propriety of applying credit time to contempt sentences. Determining that the credit time was wrongly applied to the contempt sentences, the trial judge returned Andrews to the Department of Correction for further incarceration. Andrews challenged the court's action by way of a writ in aid of appellate jurisdiction, which this court denied. No further appeal or challenge was made.

■ Any question as to the applicability of good-time credit to contempt sentences is moot in the present case.[8] An issue becomes moot when it is no longer "live" or when the parties lack a legally cognizable interest in the outcome of its resolution. *Bartholomew County Hospital v. Ryan* (1982), Ind.App., 440 N.E.2d 754, 757, *trans. denied.* When this court is unable to render effective relief upon an issue, the issue is deemed moot, and we will not reverse a lower court's determination where no change in the status quo will result. *Bartholomew,* at 757; *Krochta v. State*

---

8. We note that in at least one instance the Indiana Supreme Court refused to apply good time credits to a sentence for contempt. *In re Crumpacker* (1982), Ind., 431 N.E.2d 91, 98.

(1978), 175 Ind.App. 436, 437, 372 N.E.2d 475, 478. Andrews has fully served his sentences and, therefore, any issue regarding the applicability of good-time credit is now moot.

ROBERTSON, J., concurs.

NEAL, J., concurs with separate opinion.

NEAL, Judge, concurring.

I concur completely in the well reasoned majority opinion which is well supported by authority. I wish merely to add that the record does not reflect existence of any particular candidate or party for whom Michael Andrews wanted to cast his write-in ballot. It appears that the whole episode was a bizarre act calculated to harass, annoy, and absorb the time, energy, and efforts of election officials, prosecuting attorneys, the trial court, and now the court of appeals. Absent is any good faith motive to effect legitimate constitutional or statutory rights. While public officials and courts should be ever sensitive to the constitutional and statutory rights of citizens, they need not humor self-annointed messiahs whose sole motive is to make a nuisance out of themselves by the disruption of public business.